FOX ENTERTAINMENT GROUP, INC., Fox Broadcasting Company, Fox News, Inc., Fox News Network, Inc., Fox News Network, L.L.C., Fox News Holdings, Inc., and Bill O'Reilly, Appellants

v.

Gamal ABDEL–HAFIZ, Appellee.

No. 2–06–353–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 15, 2007.

Charles L. Babcock, Robert P. Latham, David T. Moran, Jackson Walker, L.L.P., Albon O. Head, Jr., Amanda L. Bush, Fort Worth, for Appellants.

Jeffrey N. Kaitcer, Mike Windsor, Fort Worth, for Appellee.

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

## OPINION ON REHEARING

DIXON W. HOLMAN, Justice.

We grant Appellants' motion for rehearing, withdraw our August 31, 2007 opinion and judgment, and substitute the following.

Appellant FOX brings this interlocutory appeal of the trial court's order denying its motion for traditional and no-evidence summary judgment.[1] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.2006). We reverse and render.

## BACKGROUND

Gamal Abdel–Hafiz ("Appellee"), born and educated in Egypt, came to the United States ("U.S.") to work in 1984 and became a U.S. citizen in March 1990. He became a language specialist with the Federal Bureau of Investigations ("FBI") in January 1994 and then a special agent in the Dallas FBI office. He was assigned to the Dallas FBI office's international terrorism unit from 1996 to 2001 and served as assistant legal attache to the U.S. Embassy in Saudi Arabia from 2001 to 2003.

---

1. We refer to FOX Entertainment Group, Inc., FOX Broadcasting Company, FOX News, Inc., FOX News Network, Inc., FOX News Network, L.L.C., FOX News Holdings, Inc., and Bill O'Reilly generally as "Appellant" except where otherwise noted.

He was recalled from Saudi Arabia by the FBI in February 2003 for an administrative inquiry into insurance fraud allegations made by his ex-wife. This investigation led to his termination; the FBI later reinstated him.

The underlying suit is a defamation action. The alleged defamation involves statements initially made by FBI agents Robert ("Bob") Wright and John Vincent, of the FBI's terrorism unit in Chicago, assistant U.S. attorney Mark Flessner, also based in Chicago, and FBI agent Barry Carmody, of the FBI's terrorism unit in Tampa, about Appellee with regard to FBI investigations in 1998 and 1999. Bill O'Reilly, host of THE O'REILLY FACTOR, a television program on the FOX television network, interviewed Flessner on March 4, 2003, and interviewed former FBI assistant director Bill Baker and former FBI agent Gary Aldrich about Flessner and Wright's allegations against Appellee, among other topics, on March 5, 2003. On March 6, 2003, O'Reilly also interviewed Vincent and David Schippers, Vincent and Wright's attorney.

Appellee sued Appellant for libel per se, slander per se, libel per quod, slander per quod, statutory libel, and libel and slander by innuendo and implication based on statements made in the three broadcasts and in the broadcast transcripts posted on

FOX's website (collectively, the "Broadcasts"). He further contended that the Broadcasts "omitted material facts and/or juxtaposed facts in a material way such that the gist of the publications ... was false," and listed twelve statements made by O'Reilly as defamatory.[2] Appellee sought $3.5 million in compensatory damages plus exemplary damages. We have reordered these statements chronologically:

*Statement Three:* [March 4, 2003] In the "Impact" segment tonight, very disturbing story. Charges that an FBI agent named Gamal Abdel Hafiz (ph) refused to wear a recording device in terrorist investigations of accused money men, Yassin Al-Kadi[3] and Sami Al-Arian.

*Statement Ten:* [March 5, 2003] Should FBI Chief Robert Mueller be fired over the scandal of a Muslim agent who failed to aggressively investigate terrorism?

*Statement Eleven:* [March 5, 2003] And THE FACTOR has two eyewitnesses who say Mr. Hafiz refused to wear a wire twice during terror investigations.

*Statement Four:* [March 5, 2003] According to FBI agent Robert Wright and former federal prosecutor Mark Flessner, Hafiz declined to secretly tape a Saudi citizen named Yassin Kadi, who was suspected of financing Usama bin Laden.[4] That incident happened in

---

**2.** Appellee also sued ABC, Inc., ABC News, Inc., ABC News Holding Company, Inc., Disney Enterprises, Inc., WFAA–TV, L.P., WFAA of Texas, Inc., Belo Corp., Charles Gibson, Brian Ross, Wright, and Vincent, for statements made in similar ABC broadcasts and transcript postings, and alleged the same or similar defamation-based claims in the 67th District Court of Tarrant County, Texas, in trial court cause number 067–203396–03. Brian Ross is the ABC News chief investigative correspondent responsible for ABC's December 2002 broadcast. The parties in both suits made a rule 11 agreement providing that depositions from either case could be used in both cases. *See* Tex.R. Civ. P. 11.

The 67th district court sustained Wright's and Vincent's pleas to the jurisdiction and Disney Enterprises, Inc.'s special appearance, dismissed the claims against Belo Corp., WFAA–TV, L.P., and WFAA of Texas, Inc., and granted the remaining defendants' motion for summary judgment.

**3.** Yassin Al–Kadi, Yasin Kadi, Yassin Qadi, and other variations refer to the same individual.

**4.** Usama bin Laden and Osama bin Laden refer to the same person.

April of 1999, and it happened again during the investigation of Sami Al–Arian, according to the two men. Wright says Hafiz told people, quote, "a Muslim does not record another Muslim." That is not true. Hundreds of Muslim American law enforcement agents have worn wires, according to FACTOR sources.

*Statement Five:* [March 5, 2003] But THE FACTOR has learned that Hafiz is being investigated by the office of professional responsibility at the Justice Department. That's serious.

*Statement Six:* [March 5, 2003] In THE FACTOR "Follow–Up" segment tonight, as we told you in the "Talking Points" memo, an FBI agent named Gamal Abdel–Hafiz has been put on administrative leave. He has been accused by another agent of refusing to record other Muslims who the FBI was investigating. One of the men, a Saudi named Yassin Kadi, is suspected of bankrolling Usama bin Laden. The other man was Sami Al–Arian[,] recently indicted for terrorist fund-raising.

*Statement Twelve* [the same statement as Statement Two]: [March 5, 2003] How do you know that, because we're being told by the Prosecutor in the case and Agent Wright that everybody wanted this to happen. The Tampa office in the Al–Arian case asked the man to wear a wire. He declined.

*Statement Two:* [March 5, 2003] The Tampa office . . . asked the man to wear a wire. He declined.

*Statement Seven:* [March 5, 2003] I—I just want to—I want the audience to know, Mr. Baker, that what you say,

although it might be true, is being vehemently disputed—vehemently disputed—by a number of FBI agents involved in these investigations.

*Statement Eight:* [March 5, 2003] If you have one that says, I'm not going to record another fellow Muslim, you've got to fire him, don't you?

*Statement Nine:* [March 6, 2003] This is Hafiz (ph) who refused to record Sami Al–Arian (ph). . . . Listen, we know the truth. The truth is I believe your two agents here, the guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined. . . . But he should have been disciplined, and he wasn't.

*Statement One* [the same statement as Statement Nine]: [March 6, 2003] Listen, we know the truth. The truth is, I believe your two agents here, the guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined.

As Statements One and Two duplicate portions of Statements Nine and Twelve, we will consider them subsumed within our discussion of Statements Nine and Twelve and we will not analyze them individually.

It is undisputed that around April 1999, Wright, Vincent, and Flessner asked Appellee to secretly record a Muslim suspect in an FBI investigation code-named "Vulgar Betrayal." Vulgar Betrayal's mission was "to identify and neutralize through criminal process the HAMAS terrorist support organization located within the United States." [5]

## SUMMARY JUDGMENT

### STANDARD OF REVIEW

After an adequate time for discovery, the party without the burden of proof

---

**5.** According to Wright, Vulgar Betrayal led to a seizure in June 1998 of $1.4 million of Middle Eastern terrorist funding linked directly to Saudi businessman Yasin Qadi, who was designated a financial supporter of Osama bin Laden in October 2001. In Wright's

June 1998 affidavit seeking this civil asset forfeiture, he described the relationship of Yassin Kadi, Kadi International, and its related entity, BMI, Inc., of New Jersey, to terrorism suspects involved in a money-laundering scheme.

may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. TEX.R. CIV. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex.2002). When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* TEX.R. CIV. P. 166a(i) & cmt.; *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied). "Less than a scintilla" exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003), *cert. denied*, 541 U.S. 1030, 124 S.Ct. 2097, 158 L.Ed.2d 711 (2004). "More than a scintilla" exists if it would allow reasonable and fair-minded people to differ in their conclusions. *Id.*

Texas Rule of Civil Procedure 166a does not prohibit a party from combining in a single motion a request for traditional summary judgment and a request for no-evidence summary judgment. *See* TEX.R. CIV. P. 166a(c), (i); *Binur v. Jacobo*, 135

S.W.3d 646, 650 (Tex.2004). When, as here, a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the no-evidence standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). If the non-movant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the movant's summary judgment proof satisfied the traditional summary judgment test of rule 166a(c). *Id.* On appeal from the denial of a summary judgment, we may reverse and render judgment if any of the grounds stated in the movant's motion are meritorious. *See HBO, A Div. of Time Warner Entm't Co., L.P. v. Huckabee*, 995 S.W.2d 152, 163 (Tex.App.-Houston [14th Dist.] 1998), *aff'd*, 19 S.W.3d 413 (Tex.2000).

## DEFAMATION

■ Appellee sued Appellant under various defamation theories. To maintain any of his defamation claims, Appellee had the burden to prove that Appellant: (1) published a statement; (2) that was defamatory concerning Appellee; (3) while acting with either actual malice, if Appellee was a public official or public figure, or negligence, if he was a private individual, regarding the statement's truth. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998), *cert. denied*, 526 U.S. 1051, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999). Neither party disputes that Appellant published the statements at issue. Based on the parties' summary judgment pleadings presented to the trial court, we confine our review here to the "actual malice" standard.[6]

---

6. In his first amended petition, Appellee claimed that he was a private individual. However, Appellee argues in his appellate brief that "[t]here is a genuine issue of material fact as to actual malice" and does not dispute Appellant's contention in its brief that he is a public figure. Therefore, for purposes of our review, we assume that Appellee was a

## CONSTITUTIONAL "ACTUAL MALICE"

■ In issue four, Appellant asserts that there is no evidence that the challenged statements were published with constitutional "actual malice."[7] A no-evidence summary judgment would be improper only if we conclude, after examining the entire record, that Appellee has presented evidence creating more than a surmise or suspicion that Appellant published the statements with actual malice. *See Sudan,* 199 S.W.3d at 292; *King Ranch,* 118 S.W.3d at 751.

■ "Actual malice" in the defamation sense does not include ill will, spite, or evil motive. *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989). Rather, to establish actual malice, the plaintiff must prove that the defendant published a defamatory falsehood "with knowledge that it was false or with reckless disregard of whether it was false or not." *WFAA-TV,* 978 S.W.2d at 571 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)). The actual malice standard's purpose is to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *Turner,* 38 S.W.3d at 120 (citing *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964)); *see also New York Times,* 376 U.S. at 270, 84 S.Ct. at 721 (stating that defamation cases must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and

wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). To prevail at trial, a public figure plaintiff must establish actual malice by clear and convincing evidence, but the Texas Supreme Court has declined to adopt the clear-and-convincing standard at the summary judgment stage. *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420–21 (Tex.2000).

■ The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—is not readily captured in one infallible definition. *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). And while knowledge of falsity is a relatively clear standard, reckless disregard is much less so. *See, e.g., Bentley,* 94 S.W.3d at 591 (reviewing U.S. Supreme Court cases on actual malice). Reckless disregard is a subjective standard that requires the plaintiff to bring forth evidence that the defendant entertained serious doubts as to the truth of the publication at the time it was published. *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex.2005); *see also Harte–Hanks Commuc'ns, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) (stating that reckless disregard involves a "high degree of awareness of probable falsity"); *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325 (stating that there must be sufficient evidence to permit the conclusion that the

public official, a public figure, or a limited purpose public figure. *See* TEX.R.APP. P. 38.1(f); *W. Steel Co. v. Altenburg,* 206 S.W.3d 121, 124 (Tex.2006) ("An appellate court normally accepts as true the facts stated in an appellate brief unless the opposing party contradicts them.").

**7.** To recover for defamation, a public figure suing a media defendant has the burden to prove that defamatory statements made about

him were false. *See Bentley v. Bunton,* 94 S.W.3d 561, 586 (Tex.2002). However, as we resolve Appellant's no-evidence claims here on the issue of whether Appellee raised a genuine issue of material fact as to actual malice, we need not consider whether Appellant's Broadcasts either expressly or implicitly made false statements about Appellee. *See* TEX.R.APP. P. 47.1.

defendant in fact entertained serious doubts as to the truth of his publication). And a publisher's presentation of facts may be misleading, even negligently so, but will not constitute a "calculated falsehood" unless the publisher knows or strongly suspects that it is misleading. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

 Actual malice focuses on the defendant's state of mind, particularly his attitude toward the truth of what he reported, which a plaintiff can prove through objective evidence about the publication's circumstances and the defendant's conduct at the time of publication. *Id.; WFAA–TV, Inc.,* 978 S.W.2d at 573; *see also Bentley,* 94 S.W.3d at 591, 596 (stating that defendant's lack of care and motive are factors to consider). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 162 (Tex.2004), *cert. denied,* 545 U.S. 1105, 125 S.Ct. 2557, 162 L.Ed.2d 276 (2005). Publications alleged to be defamatory must be viewed as a whole-including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself, and we consider the actual malice issue within this context. *See City of Keller v. Wilson,* 168 S.W.3d 802, 811 (Tex.2005) (citing *New Times, Inc.,* 146 S.W.3d at 158–59 for the proposition, with regard to a no-evidence assertion, that legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict).

**THE BROADCASTS**

We have reviewed the Broadcasts in their entirety. Based on the three broadcasts, the format of O'Reilly's show involved various segments, with transition blurbs about upcoming information in the broadcast between each segment. We have summarized the unrelated portions of the broadcasts for context, but we have included in their entirety the portions of the transcripts that include the alleged defamatory statements, bolding the contested statements within each.[8]

**THE O'REILLY FACTOR, March 4, 2003**

In the Introduction segment, O'Reilly gave his evening's topics as "Trust the U.N.?" with regard to pre-war decision-making, "Muslim Agent Trouble," stating that there were charges that an FBI agent of Arab descent refused to wear a wire while investigating Sami Al–Arian, and "Pro–Saddam Prof?" about a professor accused of funneling money to Saddam Hussein. In his Talking Points segment, O'Reilly talked about the need to take action on terrorism. In the Top Story segment, O'Reilly conducted an interview with the Washington editor of *The Nation* about al-Qaeda and Iraq. The transition blurb was "Pro Sami–Agent?" in which O'Reilly again mentioned the refusal of an FBI agent to wear a wire when investigating Sami Al–Arian. In the Factor Follow–Up, O'Reilly discussed al-Qaeda with a FOX foreign affairs analyst. In the transition blurb, Sami Al–Arian was mentioned again.

In the Impact segment, an interview lasting approximately five minutes, O'Reilly showed FBI Chief Robert Mueller's

8. The written transcripts were included in the voluminous summary judgment evidence presented to the trial court.

photo and then conducted a split screen interview between himself and Flessner.

O'REILLY: *In the "Impact" segment tonight, very disturbing story. Charges that an FBI agent named Amal Abdel Hafiz (ph) refused to wear a recording device in terrorist investigations of accused money men Yassin Al–Kadi and Sami Al–Arian.* [Statement Three]

Kadi was being investigated for activities surrounding the bombing of an American embassy in Africa. He lives in Saudi Arabia.

Al–Arian, as you may know, has been charged with raising money for Palestinian Islamic Jihad.

Last week the FBI put Hafiz on leave but denies he refused to wear the wire.

Now we were supposed to have FBI counter-terrorism agent Robert Wright, who worked with Hafiz, as our guest this evening, but FBI chief Robert Mueller threatened to fire him if he appeared on THE FACTOR. That happened about an hour ago.

As you may remember, we selected Mueller as one of our villains of the week for his dubious decisions, and once again, Mueller has lived down to our expectations.

Joining us now from Chicago is former federal prosecutor Mark Flessner, who worked with Mr. Wright on the Kadi case. What's FBI trying to hide here, counselor?

FLESSNER: Well, I can't tell that. I'm not privy to what the reason is that they have suspended Special Agent Al–Hafiz, but clearly, there's something big going on, since they're [sic] recalled him for re-op.

O'REILLY: Do you believe that this agent did not wear the wire?

FLESSNER: Do I believe that Special Agent Al–Hafiz did not wear the wire?

O'REILLY: Yes.

FLESSNER: Well, I was involved, of course, as you know that I was the prosecuting investigator, the attorney on the case during the investigation. The lead AUSA, assistant U.S. attorney. I was working with ... FBI Agent Robert Wright and about 13 other actual FBI agents.

I was involved in the conversations and in the negotiations with Amal Abdel Al–Hafiz during the time in which we requested him to wire up on the target or one of the targets of the investigation coming out of a company out of New Jersey. And if the question is do I believe it, I was there for it and there are some times when I think about that point in my life and can't believe it actually happened.

O'REILLY: So Hafiz, the FBI agent, all right? The FBI agent, Hafiz, flat out said I'm not wearing a wire. Now why did he say that?

FLESSNER: Well, let me just give you a little background to the story. He had been approached by—a number of subpoenas had been issued, one to a company, BMI in New Jersey. And an employee of that company contacted Al–Hafiz and asked him what the nature of the investigation was.

We were thrilled when Special Agent Hafiz contacted us and told us that he had been contacted with respect to the nature of the investigation, because we assumed that someone who wanted to know why he was to testify or what the nature of the investigation was is that he wanted to do something other than to tell the truth.

We asked Al–Hafiz to wire up, to go to the meeting, and to record the conversations and find out what the guy

wanted to know about the investigation.

There was a number of phone calls, both with Special Agent Hafiz and with his supervisor, and there was a number of correspondences that went back between the special agents in charge in Chicago . . .

O'REILLY: Bottom line, though?

FLESSNER: Bottom line is, he said, "I do not record another Muslim. That is against my religion."

O'REILLY: Really? And the same thing with Sami Al–Arian in Florida?

FLESSNER: My understanding—I wasn't involved . . .

O'REILLY: That's what Wright said. That's what Wright was going to tell us until he got pulled.

Now, since you heard it—Since you heard it, you were there, are you surprised the FBI is denying it happened?

FLESSNER: Well, I received a copy of that press release from the FBI last December.[9] They allege that the reason that Special Agent Al–Hafiz refused to cooperate with the investigation—which by the way that's the first time I have ever known an FBI agent to refuse to cooperate with an investigation—they said the reason he refused is because we had requested that he make the recording in a mosque, which was simply not true.

O'REILLY: Yes, that's not true.

So, look, the FBI, according to your testimony and Wright's testimony, is covering this up because this is an embarrassment to them. And Muel-

ler, again, we don't trust him. Flat out don't trust him. And this is another embarrassment for the FBI.

Now, Wright was told that they would fire him if he came on THE FACTOR, but they can't fire him now, right?

FLESSNER: Well, what they do with respect to this I don't know. Just in defense of Director Mueller . . .

O'REILLY: I'm not going to let you defend him because I only have 30 seconds.

He was not director then, but he is director now, Mr. Flessner.

FLESSNER: That's right.

O'REILLY: And he said flat out to Wright one hour ago, you go on THE O'REILLY FACTOR, you're toast. That's a disgrace.

We appreciate your testimony. Thanks very much.

FLESSNER: Thank you.

O'REILLY: Something very wrong at the FBI.

Plenty more ahead as THE FACTOR moves along this evening. Another college professor accused of raising money for the wrong guy, Saddam. We'll tell you what happened in a moment.

In the next transition blurb, entitled "Killing the pledge?," O'Reilly asked, "Will a liberal federal court succeed in killing the Pledge of Allegiance as we know it?" The Unresolved Problem segment followed, in which the attorney of a professor who had been terminated from his university position after he was charged with

---

9. The FBI's official statement of December 19, 2002, sent to ABC, was included in the record. The statement refers to "the alleged refusal to wear a recording device" and states that the location of the meeting was in a mosque. The official statement does not dis- close with whom the meeting was to be conducted, referring only to "a subject of the investigation." Appellee testified that the FBI's official statement was incorrect with regard to its assertion that the meeting's location was in a mosque.

funneling money to Saddam Hussein discussed his client's situation with O'Reilly.

The next interview was with a *Vanity Fair* special correspondent about Michael Jackson's charitable contributions or lack thereof and her allegations that he founded charities to get close to children. The Back of the Book segment addressed the pledge issue with regard to the Ninth Circuit's controversial "under God" ruling.[10] O'Reilly interviewed a reverend from the American Family Association about his petition to amend the U.S. Constitution to keep the words "under God" in the Pledge of Allegiance. He also interviewed a constitutional law expert about "activist judges." Near the end of the show, O'Reilly responded to email from viewers.

**THE O'REILLY FACTOR, March 5, 2003**

In the Introduction segment, O'Reilly stated:

> The O'REILLY FACTOR is on. Tonight, there's growing hostility against the USA inside the United Nations. Will the Bush Administration walk away next week and take care of Iraq outside that body? The pope says a war against Iraq would be immoral. But does the pontiff still have the moral authority to make that call? *Should FBI Chief Robert Mueller be fired over the scandal of a Muslim agent who failed to aggressively investigate terrorism?* [Statement Ten] Caution: you're about to enter the no spin zone. THE FACTOR begins in 90 seconds.

O'REILLY: Hi, I'm Bill O'Reilly. Thank you for watching us tonight.

> All hell is breaking loose inside the FBI. That's the subject of this evening's "Talking Points" memo.
>
> We sat on the story for quite awhile. But now FBI Agent Gamal Abdel-

Hafiz has been put on administrative leave. *And THE FACTOR has two eyewitnesses who say Mr. Hafiz refused to wear a wire twice during terror investigations.* [Statement Eleven]

*According to FBI agent Robert Wright and former federal prosecutor Mark Flessner, Hafiz declined to secretly tape a Saudi citizen named Yassin Kadi, who was suspected of financing Usama bin Laden.*

*That incident happened in April of 1999, and it happened again during the investigation of Sami Al–Arian, according to the two men.*

*Wright says Hafiz told people, quote, "A Muslim does not record another Muslim." That is not true. Hundreds of Muslim American law enforcement agents have worn wires, according to FACTOR sources.* [Statement Four]

Agent Hafiz apparently denies any wrongdoing and has filed an equal opportunity complaint against Agent Wright. A short time later Hafiz was promoted to the FBI's office in Saudi Arabia but again, he's now been called back here and placed on forced leave. Why? The FBI will not say.

*But THE FACTOR has learned that Hafiz is being investigated by the office of professional responsibility at the Justice Department. That's serious.* [Statement Five]

The simple question is this. Did Agent Hafiz refuse to secretly tape other Muslims involved in terror investigations, yes or no?

Now, this is the third time that FBI chief Robert Mueller has been in the vicinity of a scandal. And enough

---

10. *See Newdow v. U.S. Congress,* 328 F.3d 466 (9th Cir.2003), *rev'd sub nom. Elk Grove Uni-* *fied Sch. Dist. v. Newdow,* 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).

might be enough. He was a federal prosecutor in Boston when the FBI allowed three innocent men to stay in prison to protect an informant who had committed murder.

Mueller rewarded FBI Agent Spike Bowman with special praise after Mr. Bowman refused a request from the FBI's Minneapolis office to search accused terrorist Zacarias Moussaoui's computer in the months before 9–11. Moussaoui, of course, is now being charged with being in on the mass murder at the World Trade Center and Pentagon.

FBI Agent Colleen Rowley was so outraged by that screw-up she put her career in jeopardy and made the situation public. But Rowley was not commended by Mueller; the guy who messed up, Bowman, was.

And now we have Gamal Abdel–Hafiz. Unless director Mueller can fully explain this situation to the American people "Talking Points" believes he should be fired by President Bush.

Americans are depending on the FBI to protect them and there is growing evidence that Mueller is a bureaucratic nightmare. The FBI, we believe, is now doing an excellent job in fighting terrorism, and most field agents are magnificent. But did you know that many of those agents refer to Mueller's Washington group as "hindquarters" instead of "headquarters"?

Americans have a right to know what's happening when serious charges are leveled against a government agency.

Agent Wright is writing a book, but was told he would be charged with insubordination if he appeared on THE FACTOR last night. That's a very disturbing threat.

Bottom line. We need to know if Agent Hafiz refused to wear a wire during a terrorism investigation and why he was subsequently promoted. If the government will not answer that simple question, we are all in big trouble.

We'll have more on this coming up. And that's the memo.

The Top Story segment addressed the Iraq situation. The transition blurbs were: "Credibility Problem" with regard to the Pope and "Peace Shirt Ban." In the Unresolved Problems segment, O'Reilly talked about Pope John Paul II's stance on an invasion of Iraq as immoral and interviewed a professor about the Catholic priest sex scandal and its impact on the Pope's moral authority.

The next transition blurb was "No Peace Shirts?" and another remark, in the form of a rhetorical question, about FBI embarrassment with regard to an agent who apparently refused to wear a wire when talking with suspected terrorists. The next segment was an interview with a man and his son who had been arrested for wearing peace shirts in a mall food court. The next transition blurbs were "Hillary on the War" and "Fire Mueller?" In the Personal Story segment, O'Reilly conducted an interview with a journalist about Hillary Clinton's stance on potential war with Iraq. The transitional blurb was "Dismiss Mueller? Scandal involving Muslim agent."

In the Factor Follow–Up, O'Reilly showed a picture of the FBI seal first, then photos of Yassin Al–Kadi, Sami Al–Arian, and Mueller.

O'REILLY: Thanks for staying with us. I'm Bill O'Reilly. *In THE FACTOR "Follow–Up" Segment tonight, as we told you in the "Talking Points" memo, an FBI Agent named Gamal Abdel–Hafiz has been put on admin-*

*istrative leave. He has been accused by another agent of refusing to record other Muslims who the FBI was investigating.*

*One of the men, a Saudi named Yassin Kadi, is suspected of bankrolling Usama bin Laden. The other man was Sami Al–Arian recently indicted for terrorist fund-raising.* [Statement Six]

The question: Should FBI Chief Robert Mueller be fired since this is the third time he's been around a scandal within the FBI.

Joining us now from Los Angeles, Bill Baker, former FBI assistant director. And, in Washington, former FBI agent Gary Aldrich, author of "Unlimited Access: An FBI Agent Inside the Clinton White House."

Mr. Baker, let's go with you. Am I being unfair here?

BAKER: A little bit, Bill. Getting right to the specifics of our Muslim agent, the decision to wear a wire is not made by a field agent in a case. Otherwise, he'd have rogue cases which would be bothering you, rightfully.

In this instance, the decision by regulation is to be made by the special agent in charge. In this case it was the Dallas office. So, regardless of what it was alleged the agent Gamal may have said, the decision for him to wire up or not wire up was made by the proper person, and that's the agent in charge in Dallas.

O'REILLY: *How do you know that, because we're being told by the prosecutor in the case and Agent Wright that everybody wanted this to happen. The Tampa office in the Al–Arian case asked the man to wear a wire. He declined.* [Statement Twelve]

I mean, you're basically putting it back on the bureaucracy, and it—and maybe that's true. I mean, maybe they didn't give him a direct order, but, still, doesn't it disturb you, Mr. Baker, if a Muslim FBI agent will not record another Muslim FBI agent to bring evidence about terrorism? Isn't that disturbing to you?

BAKER: If that's the bottom line, it could be disturbing, Bill. But I'm told otherwise.

O'REILLY: Well, of course, you're told . . .

BAKER: I'm told that . . .

O'REILLY: You know, they're—they're denying it, but you would have to tell—you would have to call FBI Agent Wright a liar and the assistant—not the assistant but the prosecutor in the case a liar too. You'd have to call them both liars in order to make that case.

BAKER: I'm not calling either a liar. I'm saying that the facts—and as these facts will spin out—and, believe me, Congress is going to take a look at this just as you are.

And I'm here to tell you that, when these facts are laid out plain and simple, it's going to be Gamal's supervisor who claimed—and not a headquarters supervisor, not the hindquarters you refer to.

It's the field, and the field believed that this was not the proper occasion to wire someone up.

O'REILLY: All right. Now . . .

BAKER: These are sensitive cases, and you sometimes put a wire on.

O'REILLY: *I—I just want to—I want the audience to know, Mr. Baker, that what you say, although it might be true, is being vehemently disputed—vehemently disputed—by*

*a number of FBI agents involved in these investigations.* [Statement Seven]

How do you see it, Mr. Aldrich?

ALDRICH: Well, when we worked on undercover agents, when I was an agent, the number one priority, the criteria, I should say, for choosing an undercover agent was his willingness or her willingness to go under cover; and, if you had somebody who didn't want to go undercover and wear a wire, in this particular case we're talking about, you'd be foolish to force that agent to follow through on an investigation they did not want to participate in.

O'REILLY: OK, but let's face it. We don't have very many Muslim American agents who can infiltrate terrorist organizations.

ALDRICH: Yes. Well . . .

O'REILLY: *If you have one that says, I'm not going to record another fellow Muslim, you've got to fire him, don't you?* [Statement Eight]

ALDRICH: Well, I think it is a question of insubordination, if this is what, in fact, happened because you use the same fact situation if a Catholic, for example, refused to participate in an investigation of abortion clinic protesters. You'd have the same fact situation.

O'REILLY: Yes, I mean, look—Mr. Baker might be right. Maybe the [sic] didn't do—receive a direct order. I wasn't there. But I'll tell you the two men that we had on when Wright. . . .

You know, doesn't it disturb you, Mr. Baker, that, number one, the FBI [w]ill not clarify this case, because it's a simple question: Did he or did he not refuse to wear a wire? Yes or no. They will not clarify it.

And, number two, we were going to have Wright on last night, and they threatened to fire him for insubordination if he came on and told his story. Doesn't that disturb you, sir?

BAKER: No, I'm not necessarily disturbed by that, Bill. You've got facts right now, and the FBI has a mandate to follow its procedures. This is all going to be laid out. You're ahead of the curve here, and you have an issue.

But I'd like to tell Gary also that one of the best undercover agents the FBI had—and they made a movie out of it—Donny Brasco was his code name—was very hesitant to wear a wire. So I don't want to debate . . .

O'REILLY: Yes, because he didn't want to get . . .

BAKER: . . . whether . . .

O'REILLY: He didn't want to get killed. I understand that . . .

BAKER: Absolutely.

O'REILLY: . . . but that's part of the job.

Now, listen, Mr. Baker, one more and we'll get back to Mr. Aldrich. Doesn't it disturb you about Mueller that this guy gave this Bowman a commendation and gave Rowley a hard time in Minneapolis about the Moussaoui thing?

BAKER: Last night, Bill, you mentioned that this is the worst of times. Even in the best of times, an FBI director has one of the most challenging positions in government. He's looking over 75,000 cases and over 25,000 employees, and he's responsible to the oversight committees and to the public.

For Mueller to make up one problem in this case—I don't have the facts on Bowman and why he was promoted.

O'REILLY: A—but it's—the facts are right there, Mr. Baker.

How about you, Mr. Aldrich? That disturb you?

ALDRICH: Actually, no, and as a matter of fact, I have to side with the director's office on this one in not letting Agent Wright testify . . .

O'REILLY: No, no, no, no. I'm talking about the Zacarias Moussaoui thing. I'm talking about giving the guy, Bowman, who wouldn't OK Rowley's request for a wiretap on Moussaoui's computer before 9/11 a commendation and then giving Rowley a hard time for complaining about it.

ALDRICH: Well, as far as I know, Rowley never received any reprimand in her file or a letter of commendation or a letter of . . .

O'REILLY: Nothing.

ALDRICH: . . . or any of the things . . .

O'REILLY: Nothing. But Bowman got commended, and he's the guy that screwed the case up.

ALDRICH: Well—well, we don't know that he's the only person who screwed this case up. I think there are others involved in this. I'm not . . .

O'REILLY: All right. All right.

ALDRICH: I'm not defending the . . .

O'REILLY: Yes, you are. You both are.

ALDRICH: I'm just trying to be fair.

O'REILLY: I mean, if this is what we've got—if this is what's protecting us, a Mueller and an FBI who gives a guy a commendation who won't tap Zacharias Moussaoui's computer, and . . .

BAKER: Bill . . .

O'REILLY: I don't know what to say.

Go ahead, Mr. Baker, I'll give you the last word.

BAKER: Well, I worked very closely with Bob Mueller during the previous Gulf War, and we worked hand in glove. We prevented terrorist acts. He's a solid, proven leader. He rearranged the San Francisco U.S. Attorney's office.

He's a career prosecutor, who, after he was turned out when President Clinton took office—and, Gary, you know these details—afterwards, Mueller didn't run to a large law firm to make triple figures. He elected to go back and prosecute homicides in the district.

O'REILLY: All right.

BAKER: This—this is a proven professional, Bill. I . . .

O'REILLY: And I respect your—I'm—I could be wrong, Mr. Baker. I respect your opinion, OK? I just want an answer.

And I'm going to tell everybody watching tonight—we've got millions of people watching—if you want an answer about this wiretap, as I think we all do, Mr. Baker, Mr. Aldrich, and me, we have a link on billoreilly.com where you can get right into the White House and just say we'd like an answer on this question.

BAKER: That's fair.

O'REILLY: Thank you very much. We appreciate both your points of view.

Next up, an update on Amiri Baraka. Will the State of New Jersey finally get rid of this embarrassing poet laureate in a moment?

The transition blurb was "Why the Delay?" with regard to removal of Baraka. O'Reilly then interviewed a New Jersey Assemblyman on Baraka's 9/11 accusations. The Most Ridiculous Item of the

Day was the fact that a translator doing a voice over had used a fake accent [11]. Viewer e-mail included a response to the FBI story, to which O'Reilly retorted that the issue was that Appellee "allegedly wouldn't investigate terrorism," and O'Reilly told viewers that if they wanted an answer to whether Appellee would not wear a wire, to visit the billoreilly.com website for a link to the White House.

***THE O'REILLY FACTOR,* March 6, 2003**

In the Introduction, O'Reilly announced that there would be no Talking Points memo. The remainder of the Introduction segment addressed more controversy over the Muslim FBI agent "who apparently refused to wiretap a Muslim terror suspect." The first four interviews took approximately thirty minutes, in which O'Reilly asked his guests why Europeans hate Americans and why other countries did not see the terrorism threat that the U.S. sees. In the first transition blurb, O'Reilly asked whether the FBI was covering up anything, and in the second, he stated, "More disturbing charges about Muslim FBI Agent...."

During the Factor Follow–Up, O'Reilly showed the FBI seal, followed by Mueller's photograph and a video clip of Sami Al–Arian being arrested. The Factor Follow–Up went as follows:

O'REILLY: Thanks for staying with us. I'm Bill O'Reilly. In THE FACTOR follow-up segment tonight, we are still trying to get the FBI to answer a very simple question. Did Agent Gamal Abdel Hafiz (ph) refuse to tape fellow Muslims, including Sami al Arian (ph), who were being investigated for terrorist-related activities?

So far, the Bureau has not clarified the situation, and we've called for Director Robert Mueller to do so. Mr.

Mueller did, however, threaten to discipline FBI Agent Robert Wright if he came on THE FACTOR and testified about the incident in front of you. Agent Wright was deeply involved in the case.

But tonight, joining us from Chicago, is retired FBI Agent John Vincent, who was also an eyewitness to what happened. He is joined by attorney David Schippers, who is representing both Agent Vincent and Agent Wright.

All right, Agent Vincent, what did you see? What happened?

VINCENT: I was part of a conference telephone call between Chicago and Dallas. In attendance at this conference call w[ere] three U.S. attorneys, two agents, myself and agent Robert Wright. Also party to this conversation, of course, [wa]s Gamal Abdel Hafiz (ph) and his supervisor in Dallas.

At that conference call, U.S. Attorney Mark Flessner asked Agent Gamal (ph) if he would use a wire to record the conversation that potentially was going to take place. At that time, Gamal (ph) refused. U.S. Attorney Mark Flessner pressed him and asked him why he wouldn't. And Gamal (ph) said, you wouldn't understand, it's a cultural thing.

At that time, Flessner pushed further, and finally Gamal (ph) said a Muslim does not record another Muslim.

O'REILLY: He said that on the phone. You heard him say that?

VINCENT: Yes he did. He said it on the phone.

O'REILLY: And you wanted him to record a Saudi who was under suspi-

11. A "voice over" is an introductory narra- tion for a story.

cion of financing Osama bin Laden, correct?

VINCENT: Well, indirectly, yes. Actually, it was an official in an East Coast company that was under investigation by Robert Wright's case.

O'REILLY: But it was a Muslim individual?

VINCENT: Yes, it was a Muslim individual.

O'REILLY: All right. So when Hafiz (ph) says on the phone, and six guys heard it, a Muslim doesn't tape another Muslim, what was the reaction? What was the conversation then after that?

VINCENT: Well, there wasn't any conversation for a while. Everybody was stunned. Bob Wright and I looked at each other. We kind of knew what was coming.

U.S. Attorney Flessner said, "What is the problem?" And Gamal (ph) said, "I fear for my life." And at that time, Flessner said, "Well aren't you sure that the FBI is going to protect you?" And Gamal (ph) said, "No, the FBI can't protect me." He said, "The FBI, I don't trust them."

O'REILLY: Wow. Now why would the man fear for his life? Was the guy you were investigating that powerful?

VINCENT: Not at all. It had to do with the Muslim community there in Dallas. Gamal (ph) felt that since he was so well known and that if it ever came out that he had done this that there would be some threats to his life.

O'REILLY: OK. This was before 9/11, correct?

VINCENT: It was before 9/11.

O'REILLY: Did the case just die then or did you guys take it upstairs? Did the Dallas bureau chief for the FBI do anything?

VINCENT: Bob immediately—Bob Wright immediately called headquarters and complained about it then. Later on, I went to our office security manager, and I asked that person to call headquarters (UNINTELLIGIBLE) what had to be done to file a dereliction of duty complaint against another agent. That security officer did, on at least two separate occasions, call FBI headquarters and never received a response.

O'REILLY: OK. Now how important was the guy that you wanted him to wear the wire on, and was it an undercover wire?

VINCENT: No, it wasn't. When this whole program came out, the bureau came back and stated that we wanted him to record this conversation in a mosque. That never happened. Then after they decided that that wouldn't work, then they said that they didn't want him to record the conversation because he was represented by an attorney, but that doesn't apply either.

O'REILLY: But how important was the guy you were trying to get?

VINCENT: Well, we don't really know. We never did talk to the man.

O'REILLY: But what did you think he was doing? What were you investigating him about?

VINCENT: Well, he was part of a money-raising scheme that was funneling money over to the Middle East.

O'REILLY: Was it al Qaeda? Was it— because we heard it was Osama bin Laden's outfit.

VINCENT: Well, this is Yassin Kadi (ph). He was involved in organizing or paying for this particular company

that he was working for—this fellow was working for.

O'REILLY: All right. So there was an al Qaeda or possible al Qaeda connection there?

VINCENT: Yes. This individual was also involved in the Boston (UNINTELLIGIBLE) fiasco.

O'REILLY: I go[t] it. Now, Mr. Schippers, the FBI has recalled the Agent Hafiz (ph) from Saudi Arabia, where he was sent after this incident, and he is now, I understand, under investigation by the Justice Department's internal affairs division. What is going on here? Do you know?

SCHIPPERS: I'll tell you, I will never be able to figure this one out, Bill. I cannot understand why the FBI is putting their integrity in question over a totally indefensible action by one of their agents. There is nobody who can tell me that if an FBI agent can refuse to wear a wire when someone reaches out to talk to him.

It was the same with Sami al Arian (ph). That wasn't even wearing a wire. Arian (ph) called him and asked to talk to him. All he had to do was put an overhear device on his telephone and nobody in the world would have known that he was . . .

O'REILLY: *This is Hafiz (ph) who refused to record Sami Al–Arian (ph).* [Part of Statement Nine] So that's what the Tampa people say.

SCHIPPERS: I'll tell you, Bill, I'm getting sick to death—Bob Wright has now been totally gagged by the FBI. They go out and they call him a liar. They make statements about him. They tell people that he doesn't know what he's talking about. And then when he tries to defend himself, they say, sorry, pal, you can't talk. That's why. . . .

O'REILLY: Well, they're definitely trying to get Wright. I mean he was, as you know, an hour away from appearing with us and they gagged him. And said if you do, we will charge you with insubordination.

But I don't understand what—Mueller is embarrassed now. This is out, OK? And there's still something floating around for the Justice Department to be investigating this Hafiz (ph). Mueller said it's not on the same case. Do you have any clue what is going on?

SCHIPPERS: Bill, it's probably—you know it's what I call the Clinton mode. It's not on the same case. That's right, it's not on al Arian (ph) and maybe it's not on the Kadi (ph) case in 1999. But they are investigating him.

And what is so secret? What are they hiding? Something is being hidden here, and there's a reason that they're hiding it. And I will go to my grave trying to understand it. Aren't they interested in finding the truth?

O'REILLY: *Listen, we know the truth. The truth is I believe your two agents here, the guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined.* [Part of Statement Nine]

SCHIPPERS: I wonder why.

O'REILLY: I don't know that. *But he should have been disciplined, and he wasn't.* [Part of Statement Nine] And now Mueller is trying to keep us from finding out what the big picture is. But we're going to find it. Believe me, we will find it.

Gentlemen, thanks very much. We appreciate it.

When we come back, "The New York Times" is going to run a piece that

may hurt actor Mel Gibson. We will analyze it up next.

The Back of the Book segment was about an interview to be published in the *New York Times* with Mel Gibson's father. The Most Ridiculous Item of the Day was O'Reilly's ranking in the "Most Popular TV People" survey. The viewer emails included response to the Pope article, comments on the peace shirt and Hillary Clinton pieces, and statements about war.

## APPELLEE'S ACTUAL MALICE CONTENTIONS

Appellant contended in its summary judgment motion that there was no evidence of actual malice and states on appeal that Appellee cited no evidence with regard to O'Reilly's state of mind when the challenged statements were published, and, particularly, that there is no evidence that O'Reilly knew any of the challenged statements were false when FOX broadcast them. Appellee contends that there is a genuine issue of material fact with regard to whether Appellant made each contested statement with knowledge of its falsity or reckless disregard to its truth. The record pertaining to Appellants' state of mind consists of O'Reilly's deposition, Kristin Lazure's affidavit, deposition, and production notes ("notes")[12] prepared for the March 4, 5, and 6 broadcasts, and David Brown's affidavit and deposition.[13] Brown and Lazure were producers on

*THE O'REILLY FACTOR* in 2003; Lazure performed the research for the Broadcasts.

Appellee made the following specific contentions with regard to actual malice: (1) that Appellant purposefully avoided the truth; (2) that Appellant knew the statements were false or acted with reckless disregard to their truth or falsity; and (3) that Appellant selected its material with actual malice and made deliberate omissions.

### *Purposeful Avoidance*

■ Appellee asserted that at the time the contested statements were made, Appellant "purposely avoided the truth by not consulting sources that could have objectively verified that [Appellee] never refused an order to wear a wire" and by not checking the accuracy of the Broadcasts with the FBI, available public records, or "with independent reliable and verifiable sources" prior to publication.

■ Evidence showing that a defendant purposefully avoided the truth would be enough to suggest that he doubted a story's accuracy and would thereby constitute some evidence of actual malice. *Harte–Hanks*, 491 U.S. at 689, 692, 109 S.Ct. at 2696, 2698. In *Harte–Hanks*, the U.S. Supreme Court stated that a newspaper's failure to consult other sources that

---

**12.** These are also referred to in the record as "information packets."

**13.** Both parties submitted deposition excerpts from O'Reilly, Brown, and Lazure and affidavits from Lazure and Brown. We infer that Appellee's reference to "the affidavit of ... O'Reilly attached to the FOX Defendant's motion," actually refers to O'Reilly's deposition, as no affidavit by O'Reilly was submitted by Appellant with its motion for summary judgment. In his supplemental response to Appellant's motion for summary judgment, Appellee included additional excerpts of O'Reilly's deposition. Appellee also submitted his own

affidavit and listed deposition excerpts from Danny Defenbaugh, Ross, and Wright. However, we infer that Appellee actually meant Timothy Gossfeld instead of Ross, as he attached Gossfeld's, and not Ross's, deposition to his response. There is no deposition of Ross in the record and the only evidence, submitted by Appellant, with regard to a "Ross" is the affidavit of Brian Ross, an ABC News correspondent not at issue here. Gossfeld was Wright's former supervisor in the Chicago FBI office. Defenbaugh was the special agent in charge of the Dallas FBI office in 1999.

could have objectively verified a story brought by a single, unreliable source was evidence that the newspaper purposefully avoided learning facts that would have shown the story to be false and supported a finding of actual malice. *Id.* at 692, 109 S.Ct. at 2698; *cf. Skeen*, 159 S.W.3d at 638 (stating that purposeful avoidance theory was not supported when defendants conducted five months of research involving interviews with parties on both sides of the issue, including the defamation plaintiffs, reviewed the court records of the cases discussed in the article, and there were no existing sources to easily disprove the criticisms in the article); *Huckabee*, 19 S.W.3d at 427–28 (stating that where film makers interviewed several people on both sides of the story, performed extensive research, and no source could have easily proved or disproved the film's allegations, finding of purposeful avoidance was precluded). However, the mere failure to investigate or to act reasonably before publishing a statement is distinct from actual malice, because "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325; *see also New York Times*, 376 U.S. at 287, 84 S.Ct. at 730 (stating that with respect to the newspaper's failure to check advertisement's factual accuracy, the record showed that it relied upon its knowledge of the good reputation of many of those whose names were listed as the advertisement's sponsors and upon the letter from the advertisement's sender, known to it as a responsible individual and certifying that the use of the names was authorized).

To support his purposeful avoidance contention, Appellee presented evidence that Appellant never contacted Gossfeld, who had been the Supervisory Senior Resident Agent in the Chicago FBI office.[14] Gossfeld testified that neither ABC, nor FOX, nor any other media attempted to contact his office and speak with him at any time with regard to Wright and Vincent's allegations. Appellee also claims that Appellant failed to check the accuracy of the Broadcasts with the FBI or available public records.

O'Reilly testified that he has been an anchor at FOX News for nine-and-a-half years, has master's degrees in broadcast journalism and public administration, and began his career in the news business in 1976. He testified that Lazure had been the story coordinator responsible for gathering the information and that he did not remember "any of the minutia of how the story developed. I can only tell you that the story piqued my interest, I assigned it, it came back with three primary sources, once you have three primary sources on a story you go with it."[15] He listed the three primary sources as Flessner, Vincent, and Wright. He also testified that Lazure had been instructed to call Appellee, although he did not know whether she called him, and that his orders to his staff were to "get [Appellee's] point of view, get him on the program."

Brown testified that he has a bachelor of arts degree in film and has been with FOX

---

14. Appellee also attached deposition excerpts from Defenbaugh, but Defenbaugh only testified that he spoke with "possibly somebody from the media" and that he would never have told anyone that the decision to not wear a wire was Appellee's. He testified that he would have been the one to decide whether Appellee would wear a wire.

15. He repeated this later in the deposition, stating, "Look, we saw the story [about Appellee], we put it into motion, we investigated it, we got our three primary sources, and we put it on the air."

for ten years in various capacities. He described the research procedure,

> You'd look for stories, get them approved, find the appropriate guest, do a pre-interview, get pertinent background information, factual information. Prepare a packet of information for Bill O'Reilly and for the producer to go through. Find supporting tape, video, B-roll. Put together the complete package, have it wrapped up, neat in a bow for him to go on air that evening.

He testified that part of Lazure's job was to accurately get guests' points of view. With regard to accuracy, Brown testified that it was "[b]etter to be accurate than first," and that accuracy was paramount in reporting, so much so that "you get it right or you just don't do it at all."

Lazure testified that she has a degree in journalism from Vanderbilt University. In her affidavit, she stated:

> I performed research for the March 4, 5, and 6, 2003 programs which are the subject of this suit. . . . I believe that all of the statements in those broadcasts were either literally or substantially true at the time of the broadcasts. I did not then and do not now entertain any doubt, serious or otherwise, about the truth of the statements in the March 4, 5, and 6, 2003 broadcasts.

She testified that she prepared the information packets that O'Reilly used to prepare for the Broadcasts, describing the process as taking information from other reports and putting it at the top of the packet with attribution to the source material, then information about the guests, information about what the guests told her, and then information she received after speaking to an FBI representative.[16] Lazure's notes from March 4, 5, and 6, 2003 contain the following information: the subject, in capital letters, followed by background information on the subject, then information on each guest, the guest's point of view, and other related facts and statistics.

Lazure testified that she invited someone from the FBI to come on the show and that "it [was] standard protocol to always invite them." Her notes reflect that she did contact the FBI but that she did not receive an official statement. The unofficial FBI statement covering March 4 and 5 merely indicates that the FBI agent with whom Lazure spoke informed her that he had "personally . . . never been able to substantiate" the claim that Appellee refused to wear a wire, that Appellee denied it, and that the suggestion that Appellee refused to wear a wire was "ridiculous." The unofficial statement in Lazure's March 6 notes states that the FBI's position "is that one agent alone doesn't decide whether or not to wear a wire" and that the FBI agent with whom Lazure spoke could only speculate why the other FBI agents and U.S. attorneys claimed they witnessed Appellee state that "[a] Muslim does not record another Muslim."

O'Reilly testified that he did not receive an official statement from the FBI about the issue, that he had no documentation from the FBI, that the FBI would not appear on camera, that the FBI did not give clarification to Lazure in an official capacity, and that was all that they would use. He stated that because the information received by Lazure from the FBI was not an "official statement," that is, either on camera or on FBI stationery, it was "background" and "hearsay," and they did not use it because "we do not use hearsay or he said she said." O'Reilly testified that, with regard to Ed Cogswell and John Ianarelli, two FBI representatives with

---

**16.** The FBI did not provide an official statement to FOX, but it did provide one to ABC.

whom Lazure had contact, "they were not in on the investigation as the other three individuals that we put on, two on camera and one for background, were." Cogswell's and Ianarelli's comments were in Lazure's March 6 notes.

Appellant attached Wright's sworn EEOC statement to its summary judgment motion, giving his version of the 1999 incident, including Appellee's statement during the conference call that he would only record the individual if he told him he was wearing a wire, that he feared for his safety and did not trust the FBI to protect him, and that "[a] Muslim does not record another Muslim." Lazure's notes indicate that Appellant was aware of the EEOC filing, and Wright's EEOC statement is listed as a source in the *Wall Street Journal* article that O'Reilly testified triggered his interest in the story.[17]

O'Reilly testified that he was not aware of any credibility issues with regard to Wright prior to the broadcast. Lazure's notes for all three Broadcasts state that Wright was "a controversial agent (represented by both Judicial Watch and House impeachment counsel David Schippers) who has gone public several times in the last year with charges that the FBI has thwarted his counterterrorism investigations," but there is nothing in her notes to indicate that Wright was not credible. O'Reilly testified that he had always found Schippers "a very credible guest for us" and that Schippers had "always been accurate." *See New York Times*, 376 U.S. at

287, 84 S.Ct. at 730 (stating that showing that the newspaper relied upon its knowledge of the good repute of the listed sponsors and sender did not support actual malice claim).

Although Appellant did not contact Gossfeld, it did consult more than one source in preparation for its story, per its described research protocol of obtaining three primary sources, and there is no evidence, based upon the sworn statements of the individuals Appellant did contact and its position on "unofficial statements," that Appellant knew that its sources were unreliable or had serious doubts about their reliability. *Cf. Harte–Hanks*, 491 U.S. at 692, 109 S.Ct. at 2698. Because the record indicates that Lazure did check with the FBI, albeit unofficially, and that neither O'Reilly nor Lazure doubted the credibility of the statements made by their three primary sources at the time that the Broadcasts were made, there is no evidence that Appellant purposefully avoided the truth, and, therefore, Appellee's actual malice argument on this point fails. *Cf. id.* (holding that reliance on single, unreliable source supported finding of purposeful avoidance).

### Statements

Appellee claimed that the challenged statements were made with actual malice. Appellee's issues with regard to the challenged statements pertain to: (1) refusal to obey orders; (2) Yassin Kadi; (3) Sami Al–Arian; and (4) O'Reilly's assertion of

---

**17.** The *Wall Street Journal* article, entitled, "Muslim FBI Agent is Accused of Not Taping Terror Suspects," was published on November 26, 2002. The article contained Wright's and Carmody's allegations and stated that the allegations were first made in 2000 "in response to an internal discrimination complaint filed against the FBI by the Muslim agent, Gamal Abdel–Hafiz, then stationed in Dallas." The article indicated that Wright's affidavit in response to the internal com-

plaint, including the allegation that Appellee refused to wear a hidden microphone and said that "[a] Muslim does not record another Muslim," was released by the FBI under the Freedom of Information Act. The article stated that Wright alleged that Appellee refused to cooperate with an FBI probe into BMI, Inc., a company "that figure[d] in government investigations of Yassin Qadi, a Saudi businessman whom the U.S. government says is a supporter of terrorism."

"the truth." We will also address the remaining portions of the challenged statements within this section.

### (1) Refusal To Obey Orders

■ Appellee's general contention is that he was not ordered, and so did not refuse, to secretly record other Muslims. He asserts that Appellant knew that Appellee had expressed procedural misgivings with regard to wearing a concealed recording device, that he never refused any order to wear one or to record telephone conversations, and that he never "cited any religious reasons for not wanting to surreptitiously record other Muslims." He also claims that Appellant knew that he was expressly ordered *not* to wear a wire by his Dallas FBI superiors and that, although Appellant knew all of this information at the time of the Broadcasts, "they disregarded it, at the expense of the veracity of the information they conveyed." In his response to Appellant's summary judgment motion, Appellee contended that Appellant stated that he refused "to obey orders to surreptitiously record fellow Muslims with respect to ongoing terrorism investigations" and that the refusal-to-wear-a-wire statements were made with actual malice because Appellant was "aware that the FBI had a hierarchy in how it conducted investigations."

#### Refusal Statements

During the three Broadcasts, O'Reilly indicated that, with regard to FBI terrorism investigations, there were charges that Appellee "refused to wear a recording device" [Part of Statement Three], that there were eyewitnesses who said Appellee "refused to wear a wire" [Part of Statement Eleven], that Wright and Flessner said Appellee "declined to secretly tape ..." [Part of Statement Four], and that another agent had accused Appellee "of refusing to record other Muslims who the FBI was investigating" [Part of Statement Six].[18]

O'Reilly made the statement, "The Tampa office in the Al–Arian case asked [Appellee] to wear a wire. He declined." [Part of Statement Twelve]. He reiterated, "This is [Appellee] who refused to record Sami Al–Arian (ph). So that's what the Tampa people say," [Part of Statement Nine] and, at the conclusion of the third broadcast, stated, "The truth is, I believe your two agents here, the guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined" [Part of Statement Nine] and opined that Appellee should have been disciplined.

#### Procedural Misgivings

O'Reilly's deposition and Lazure's affidavit, deposition, and notes reveal nothing about any pre-Broadcast knowledge of Appellee's asserted procedural misgivings.[19] In the March 6 broadcast, Vincent indicated that one of Appellee's stated reasons for refusing was that he was afraid that threats would be made on his life if he did it and that the FBI could not protect him. There is no evidence in the record to show that O'Reilly was aware of this misgiving, or any other, prior to the Broadcasts.

#### FBI Decision–Making Hierarchy And Orders

Appellee claims that O'Reilly understood that the FBI worked within a hierarchy.

---

18. O'Reilly twice asked the question about whether Appellee refused to secretly tape other Muslims involved in terror investigations and stated, "We need to know if [Appellee] refused to wear a wire during a terrorism investigation and why he was subsequently promoted." These questions and statement are not included in the challenged statements.

19. Lazure's March 6 notes include Ianarelli's unofficial statement about *the FBI's* procedural concerns with regard to recording and the Fourth Amendment, but contain nothing about *Appellee's* asserted procedural concerns. Appellee gives no hint in any of his pleadings regarding what his "procedural concerns" involved.

As evidence that O'Reilly's statements that Appellee had refused to wear a recording device were made with actual malice, Appellee cites O'Reilly's statement in the March 4 broadcast that Wright was prohibited by his FBI superiors from appearing. He also asserts that Appellant was aware of FBI hierarchy because Appellant was in possession of the FBI's press statement indicating that the decision regarding the investigation was made by management in the Dallas FBI office.

Lazure's notes for all three Broadcasts reference the ABCNEWS *Primetime* report from December 2002 as reporting that Appellee, a Muslim, "had twice refused *requests* by other FBI agents to secretly record conversations with Muslims suspected of supporting terrorism activities." [Emphasis added.] Lazure's headline in the March 4 notes is, "MUSLIM FBI AGENT REFUSED TO WEAR WIRE WITH AL–ARIAN," and we infer that this was the basis for O'Reilly's statements in the Introduction and transition blurbs of the March 4 broadcast. Lazure swore in her affidavit that she believed all of the statements in the Broadcasts were either literally or substantially true at the time of the Broadcasts and that she did not entertain any doubt about their truth.

Lazure's notes for all three Broadcasts include Wright's claims that Appellee refused to wear a wire and to secretly record a conversation with Al–Arian in 1998 and one of Kadi's suspected associates in 1999, both Muslims, and that Appellee made the statement, "A Muslim does not record another Muslim." All of the notes include the unofficial FBI statement that Appellee "vehemently denies that he refused to wear the wire" and proclaims, "any suggestion that [Appellee] refused to wear

[the wire] is ridiculous. Our agency does not work that way." However, the unofficial statement does not make clear how the agency *does* work, other than alluding to "layers of management that make a decision on whether or not someone will wear a concealed wire."[20] Lazure's notes on Baker's point of view for the March 5 broadcast indicated that Baker thought that, based on what his sources had told him, it "will come out that management made the call for him not to wear the wire." The unofficial FBI statement from Ianarelli in the March 6 notes states that "the Muslim agent didn't make the call not to wear a wire, his superiors did." Cogswell's unofficial FBI statement in the March 6 notes state that it was a managerial decision made by the special agents in charge "in the Dallas *and* Chicago offices." [Emphasis added.] O'Reilly testified that he considered the unofficial FBI statements background material.

Per the reference in Lazure's March 6 notes, it would appear that O'Reilly or his staff was aware of the FBI's official statement to ABC in December 2002, which made reference to "the alleged refusal to wear a recording device" and that the agent in charge had indicated that "had the consensual monitoring been requested for any location other than a mosque, [Appellee] *would have supported the proposal.*" [Emphasis added.] The official FBI statement indicates that "[u]ltimately, the decision was made by management of the Dallas office," which *"concurred with [Appellee's] request not to conduct the consensual monitoring."* [Emphasis added.]

In none of the Broadcasts did O'Reilly directly state that Appellee had received

---

**20.** It does not explain, for example, the distinction between the Chicago and Dallas FBI offices, and who had the right to order or to request that Appellee wear a wire, discussed below.

*an order* and refused to follow it.[21] There is no evidence that, as of the March 4 broadcast, O'Reilly had an understanding that there was a distinction in the FBI between a "request" and an "order," or who would have the authority to make a request or to issue an order, assuming that O'Reilly read the unofficial FBI statement about layers of management.[22] During the March 4 broadcast, when Flessner started describing the discussion process between the Chicago and Dallas FBI offices and the Chicago federal prosecutors, O'Reilly cut him off with, "Bottom line, though?" O'Reilly testified that he was not aware of FBI regulations about field agents making statements to the media, and his three days of expressing outrage that Wright was prevented from appearing on his show support this testimony.[23]

During the March 5 broadcast, O'Reilly acknowledged to Baker, "[M]aybe *they* didn't give [Appellee] a direct order," but it is unclear whether "they" referred to Wright, Flessner, the Tampa office, or "the bureaucracy" generally. [Emphasis added.] Appellee points to Baker's statements informing O'Reilly in the March 5 broadcast that it was not the agent's deci-

sion to wear or not wear a recording device, arguing that "[d]espite this information, in the March 6, 2003 broadcast," O'Reilly "is back to stating that [Appellee] refused to wear a recording device" and "goes so far as to state that [Appellee] would not tape other Muslims, and 'that's the truth.' "

During the March 5 broadcast, Baker said to O'Reilly, "the decision to wear a wire is not made by a field agent in a case . . .[;] the decision by regulation is to be made by the special agent in charge," and told O'Reilly that in this case, that would have been the special agent in charge in Dallas. O'Reilly countered, *"How do you know that,* because we're being told by [Flessner] and Agent Wright that *everybody* wanted this to happen." [Emphasis added.] Baker responded, "I'm told otherwise," and informed O'Reilly that once all the facts were laid out, it would be Appellee's supervisor in the field who made the decision. O'Reilly responded with Statement Seven, about the FBI agents disputing Baker's statement and turned to Aldrich for his comments. During Aldrich's interview, O'Reilly admitted, "Mr. Baker might be right. Maybe [he] didn't . . .

---

**21.** Not until his deposition, three years later, did O'Reilly even restate one of the issues underlying the Broadcasts as "whether an FBI agent refused *an order* to tape another Muslim." [Emphasis added.] However, the issue here is not the truth of whether Appellee actually received an order and refused to follow it—the issue here is whether O'Reilly published the challenged statements with knowledge that they were false or with reckless disregard as to their truth or falsity.

**22.** In Gossfeld's testimony, he distinguished the Chicago FBI's "request" from an "order," stating, "It's a request from the Chicago FBI office, which would have been made to the Dallas FBI office, and the agents in Dallas would be under the command structure of the Dallas management." It is undisputed that Appellant did not contact Gossfeld.

**23.** His personal invitation to Appellee after the Broadcasts also tends to support this, although Appellee had been fired by that time. On October 18, 19, and 20, 2003, Appellee was interviewed by CBS 11 about his termination from the FBI. He blamed his termination on the allegations that he refused to wiretap fellow Muslims and bias against Muslims within the government.

On October 20, 2003, O'Reilly called Appellee and invited him to come on his show to put forth his point of view. A transcript of their phone conversation was included in the record because Appellee recorded it. O'Reilly indicated at his deposition that this was the first time he had notice that Appellee had tape recorded him and remarked, "[I]t is certainly unprofessional to tape somebody without telling them."

receive a direct order. I wasn't there." There was no evidence based on the March 4 and 5 interviews or notes to indicate that O'Reilly knew that the refusal allegations were false or that he was convinced by Baker sufficiently to have serious doubts about the truth of the statements he later made.

During the March 6 broadcast, O'Reilly stated that he was still trying to get the FBI to answer the question, "Did [Appellee] refuse to tape fellow Muslims ... who were being investigated for terrorist-related activities?" During the interview, Vincent said that Appellee refused and said that "a Muslim does not record another Muslim." During his interview with Schippers about the Al–Arian incident, O'Reilly rephrased Schippers' statement as, "This is [Appellee] who refused to record Sami Al–Arian," and added, "So that's what the Tampa people say." [24] At the end of the interview, in response to Schippers' question about the FBI, "aren't they interested in finding the truth?" O'Reilly replied, "Listen, we know the truth. The truth is, I believe your two agents here, the guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined." [25] In Statement Nine, O'Reilly merely summarized what his guests told him on March 4 and March 6 about Appellee not taping other Muslims.

During the March 4 broadcast, O'Reilly asserted, with regard to Wright, "FBI chief Robert Mueller threatened to fire him if he appeared on THE FACTOR."

During the Flessner interview, O'Reilly, leading into another question, stated

> the FBI, according to your testimony and Wright's testimony, is covering [the wire issue] up because this is an embarrassment to them. And Mueller, again, we don't trust him. Flat out don't trust him.... Wright was told that *they* would fire him if he came on THE FACTOR, but *they* can't fire him now, right? [Emphasis added.]

He also made the assertion, "[Mueller] said flat out to Wright one hour ago, you go on THE O'REILLY FACTOR, you're toast."

During the March 5 broadcast, O'Reilly stated, "Wright is writing a book, but was told he would be charged with insubordination if he appeared on THE FACTOR last night," and "we were going to have Wright on last night, and *they* threatened to fire him for insubordination if he came on and told his story." [Emphasis added.] During the March 6 broadcast, O'Reilly stated, "Mr. Mueller did ... threaten to discipline FBI Agent Robert Wright if he came on THE FACTOR and testified about the incident in front of you." Schippers, Wright's attorney, stated, "Bob Wright has now been totally gagged by the FBI. *They* go out and *they* call him a liar...." [Emphasis added.] O'Reilly responded with, "*[T]hey're* definitely trying to get Wright ... he was an hour away from appearing with us and *they* gagged him. And said if you do, we will charge you with insubordination." [Emphasis added.] Other than Mueller, the nebulous "they" is

---

**24.** This is part of Statement Nine. Schippers had said, "It was the same with Sami Al–Arian. That wasn't even wearing a wire. Arian called him and asked to talk to him. All he had to do was put an overhear device on his telephone and nobody in the world would have known that he was...." Lazure's program notes for all three Broadcasts indicate that Wright said that one of the refus-

al incidents was in 1998, "when [Appellee] refused to record a conversation with Sami Al–Arian, who was being investigated in Tampa."

**25.** This is the other part of Statement Nine. We discuss O'Reilly's assertion about "the truth" below.

never identified. Even indulging every reasonable inference in Appellee's favor, a plain reading of O'Reilly's comments about Mueller, Wright, and the FBI tends to indicate more that O'Reilly had no idea about how the FBI hierarchy worked, rather than such a clear picture of how decisions were made within the agency that his statements would indicate any knowledge of falsity, or serious doubts with regard to the truth, of the refusal statements.

### Order Not To Wear A Wire And Religious Reasons

There is also no evidence that Appellant knew that Appellee "was expressly ordered not to wear a wire" at the time of the Broadcasts. The unofficial statement in Lazure's notes does not indicate that the Dallas FBI office ordered Appellee not to wear the wire, and nothing else in the record from the time of publication indicates that Appellant was aware of any express orders to Appellee to not wear a wire. *See Skeen*, 159 S.W.3d at 637.

With regard to Appellee's assertion that Appellant knew that he had never cited any religious reasons for not wanting to surreptitiously record other Muslims, no evidence in the record supports it. There is, however, considerable evidence to the contrary in the form of the statements captured in Lazure's notes and from O'Reilly's guests, Flessner and Vincent. Flessner said in the March 4 interview that he heard Appellee say, "I do not record another Muslim. That is against my religion." Vincent said in the March 6 interview, "[Appellee] said a Muslim does not record another Muslim." Lazure's March 4 notes contained Wright's statement that Appellee said, "A Muslim does

not record another Muslim." O'Reilly repeated this statement on March 5 as "Wright says Hafiz told people, quote, 'A Muslim does not record another Muslim.' "[26] No evidence in the record shows that O'Reilly believed these statements to be false or that he had serious doubts about their truth.

Because a defendant has to have either known his statements were false or entertained serious doubts as to their truth at the time of publication, and nothing here showed that O'Reilly either had such doubts or that he knew anything about Appellee's procedural misgivings, orders, or the FBI hierarchy outside of the allegations attributed to Wright, Vincent, and Flessner in Lazure's notes or made by his various guests during the interviews, there was no evidence of actual malice as to these issues. *See Skeen*, 159 S.W.3d at 637.

Therefore, with regard to the portions of Statements Three, Four, Six, Nine, Eleven, and Twelve, and Statements One and Two subsumed within Statements Nine and Twelve, that pertain to Appellee's alleged refusal to record other Muslims, we conclude that Appellee has not demonstrated a genuine issue of material fact with regard to actual malice.

### (2) Yassin Kadi Statements

 O'Reilly made three statements that included a reference to Kadi: Statements Three, Four, and Six.[27] Statement Three was made during the March 4 broadcast and Statements Four and Six were made during the March 5 broadcast. Appellee contends that O'Reilly falsely reported that Kadi was the target of the proposed surveillance, even though FOX's

---

**26.** This statement, quoting Wright, was also made in the *Wall Street Journal* article that O'Reilly testified piqued his interest in the story.

**27.** These statements also include a reference to Sami Al–Arian, as discussed below.

own pre-broadcast memos indicated otherwise, and that this constitutes objective evidence that raises a genuine issue of material fact as to whether O'Reilly and FOX entertained serious doubts as to the truth of the Broadcasts. Appellee complains that Appellant was told that the person to be recorded was not Kadi and that the investigation was related to the 1998 African Embassy bombings but that Appellant still "reported that the person to be recorded was Mr. Kadi and implied that the investigation somehow related to '9/11'." He states that with regard to Kadi, O'Reilly made his assertions "despite the fact that [Appellant] and that part of the program information packets prepared by his own producer flatly stated that the person [Appellee] was asked to record by the Chicago FBI office was not Mr. Kadi, but was an unnamed associate of Mr. Kadi."

Appellant responds that there is no evidence that O'Reilly knew the statements about Kadi were materially false when he broadcast them and that there is no evidence that O'Reilly actually saw any pre-broadcast memo with regard to the proposed surveillance target, only Brown's speculation that O'Reilly "would have seen" the memo and Lazure's testimony that she did not recall if O'Reilly saw the memo or if she discussed it with him prior to the broadcast.[28] O'Reilly identified Lazure's March 6 notes during his deposition as the information that was prepared for him, but there is no other testimony by O'Reilly in the record about Lazure's notes for the three Broadcasts, nor any testimony that he read what was prepared for him.

*March 4 Broadcast*

During the March 4 broadcast, O'Reilly made Statement Three, "In the 'Impact'

segment tonight, very disturbing story. Charges that an FBI agent named Amal Abdel Hafiz (ph) refused to wear a recording device in terrorist investigations of accused money men Yassin Al–Kadi and Sami Al–Arian." O'Reilly testified that he writes the introductions to interviews and that on March 4, the "intro" that he wrote went to where Flessner began speaking. Therefore, the record establishes that O'Reilly actually wrote Statement Three, rather than the "unscripted" conversation he testified occurs "once the interview starts." The record also tends to establish that he at least skimmed Lazure's March 4 notes because his lead-in for the broadcast and the facts that he used closely parallel the information in the March 4 notes, specifically:

(1) The program's initial lead-in included the header "Muslim Agent Trouble," and O'Reilly stating there were charges that an FBI agent of Arab descent refused to wear a wire while investigating Sami Al–Arian. The headline of Lazure's March 4 notes was "Muslim FBI Agent refused to wear wire with Al–Arian."

(2) O'Reilly stated that Kadi was being investigated for activities surrounding the bombing of an American embassy in Africa; Lazure's notes state, "[M]oney for the 1998 African embassy bombings led back to Kadi."

(3) O'Reilly stated that Kadi lives in Saudi Arabia; Lazure's notes state, "Kadi is a powerful Saudi Arabian businessman."

(4) O'Reilly stated that Al–Arian had been charged with raising money for Palestinian Islamic Jihad; Lazure's

---

28. Appellant also contends that the actual identity of the Muslim suspect was "a matter of secondary importance," as the "gist" of the

Broadcasts remained the same with regard to the allegations made by Wright, Vincent, Flessner, and Carmody.

notes state that Al–Arian was indicted two weeks before on fifty counts by a federal grand jury in Tampa and had been arrested on charges that he headed the U.S. branch of the Palestinian Islamic Jihad, and money laundering was among the charges.

(5) O'Reilly stated, "Last week, the FBI put Hafiz on leave but denies he refused to wear the wire"; Lazure's notes state, "Last week, the FBI placed [Appellee] on administrative leave and ordered him back to the United States," and include the unofficial FBI statement that "[a]ny suggestion that he refused to wear [a wire] is ridiculous."

(6) O'Reilly stated, "[W]e were supposed to have FBI counter-terrorism agent Robert Wright, who worked with Hafiz, as our guest this evening, but FBI chief Robert Mueller threatened to fire him if he appeared on THE FACTOR. That happened about an hour ago." Lazure's notes state to O'Reilly, "YOU MUST SAY THAT HE IS NOT APPEARING AS A REPRESENTATIVE OF [THE] FBI—THEY'RE PUTTING A LOT OF PRESSURE ON HIM NOT TO DO THE SHOW."

(7) O'Reilly introduced Flessner as a former federal prosecutor "who worked with Mr. Wright on the Kadi case." Lazure's notes state that Flessner was a "fmr fed prosecutor, who worked w/ Agent Wright on Yassin Kadi case."

When asked, with regard to Statement Three, whether he had a belief that Appellee had refused to record Kadi, O'Reilly testified, "No, it clearly says he's accused in charges. I don't have a belief—I wasn't there and I clearly stated that I wasn't there and I didn't know." [29] The introduction O'Reilly wrote for the Impact Segment referred to "terrorist investigations" of Kadi, and not a specific investigation of Kadi himself.[30] Having reviewed the language used in Statement Three, the March 4 broadcast in its entirety, the depositions of O'Reilly, Brown, and Lazure, Lazure's affidavit and notes, and O'Reilly's testimony that he would not write anything that "[he] would not think is true," we conclude that there is no evidence that Appellant made an intentional or reckless false statement with regard to the Kadi reference in Statement Three.

*March 5 Broadcast*

The record clearly reflects that O'Reilly made a mistake during the March 5 broadcast in reporting that Appellee refused to record Kadi, in Statements Four and Six. However, it does not reflect that O'Reilly made these statements knowing they were false or with reckless disregard to their truth or falsity.

Brown testified that Lazure's notes were part of what O'Reilly generally used and

**29.** He also testified that, with regard to what he said about Kadi, "we raised the question" and "that this was the accusation, not only there but on a number of other occasions, that this was the accusation."

**30.** The first sentence of the third paragraph of Lazure's March 4 notes states, "In April 1999, [Appellee] also refused to secretly record a conversation with *one of Yassin Kadi's suspected associates*, who was a Muslim." [Emphasis added.] Her notes on Wright's point of view merely state that it was the investigation of a businessman suspected of financial

links to "UBL," and, in her notes on "facts/ stats," she included the following information:

—in Dec., Wright told ABCNEWS that the Clinton–Reno Justice Department refused to allow him to investigate a key figure (Yassin Kadi) tied to UBL—he said he pressed for authorization to open a criminal investigation into a money trail that lead from a suspected terrorism cell in Chicago to UBL—his supervisor stopped him—his attorneys filed suit against the Justice Dept over the episode[.]

relied on in making his statements and that O'Reilly would have seen Lazure's March 4, 5, and 6 notes. However, there is no testimony that O'Reilly actually saw the March 5 notes, and Lazure specifically testified that she did not remember discussing the March 5 notes with O'Reilly. And, unlike the March 4 notes, other than the headline, Statement Ten, O'Reilly's statements during the broadcast do not parallel Lazure's March 5 notes.[31]

Lazure's March 5 notes begin after the subject headline with the same information as her March 4 notes, presented as a large block of text instead of the four neat paragraphs of the previous day. The pertinent sentence, "In April 1999, [Appellee] also refused to secretly record a conversation with one of Yassin Kadi's suspected associates, who was a Muslim," is buried approximately halfway through the block of text. Its placement in the previous day's notes is the first sentence of the third paragraph. The text block concludes with two new sentences about Wright. The notes then describe the two guests, Baker and Aldrich and their points of view, provide the prior day's unofficial FBI statement with the notation that Lazure was still waiting on the FBI's statement for March 5, and, in addition to the same facts from March 4, a new fact that Mueller was appointed by Bush in July 2001. Lazure also included new background information on Kadi:

ABOUT YASSIN KADI (pronounced kah-dee)

—Saudi multimillionaire involved in banking, chemicals, diamonds and real estate who the FBI has been investigating for years.

—In 1999, the FBI shut down the investigation against him.

—In October 2001, he was designated by the U.S. government as a financial supporter of UBL

—[H]e is one of 12 on a secret list of Saudi businessmen who funnel money to UBL

—[T]he U.S. Treasury Department froze Kadi's assets, alleging that his Blessed Relief charity had funneled money to Osama bin Laden—he has denied any connection with terrorism

—Yassin Kadi has challenged the freezing of his assets in Britain in a British court. He and four others on the U.S. freeze list also filed administrative appeals with the Treasury Department

—[H]e is currently living in Riyadh and Jedda, operating his businesses

—[T]he Justice Department now says it is pursuing possible criminal charges against Kadi—in December, U.S. customs agents searched a Boston company, which provides computers and software to the FBI, believed to be secretly operated and controlled by Kadi.

Lazure also included the following new facts on the FBI:

—In May, the FBI came under intense pressure to explain why its top officials had apparently stymied efforts by their own agents to investigate a long and clear pattern of evidence that Islamic extremists were plotting terror attacks on U.S. soil. In a letter to FBI director Robert Mueller, Colleen Rowley, the FBI agent in Minnesota who tipped off her superiors last August to the activities of Zacarias Moussaoui, the alleged "20th hijacker" and the sole person

---

**31.** In Statement Ten, O'Reilly stated, "Should FBI Chief Robert Mueller be fired over the scandal of a Muslim agent who failed to aggressively investigate terrorism?" The subject headline of Lazure's March 5 notes state,

"FBI FOLLOW–UP—Should FBI chief Robert Mueller be blamed because a Muslim agent failed to aggressively investigate Muslim suspects? Has leadership gotten any better under Mueller than it was under Freeh?"

charged in the 11 September attacks, accused the agency of operating in "a climate of fear which has chilled aggressive . . . law enforcement action."

—Judge Brinkema August 28, 2002 ordered the FBI to explain why it had not been able to retrieve any electronic mail messages from a free e-mail account Moussaoui claimed to have used. The FBI September 4 wrote in a 15–page affidavit that the contents of Moussaoui's e-mail account had been stored on the computers of Microsoft Corp., the software company that owned the e-mail service. Microsoft had told the FBI that it deleted the e-mail messages of inactive accounts after 30 days, and the entire account after 90 days. Since the FBI had not learned of the account until Moussaoui told them about it in June, 10 months after his incarceration, and because Moussaoui had apparently not downloaded any of his messages, the FBI had found no trace of the account, the affidavit explained.

When comparing Lazure's March 5 notes with O'Reilly's discussion of Moussaoui in the Talking Points segment and in his interviews with Baker and Aldrich, it becomes apparent that in preparing for the show O'Reilly either reviewed some other information not included in the record or he was already somewhat familiar with the non-Kadi topics discussed. Fur-

ther, it appears that O'Reilly either did not review Lazure's March 5 notes or did not review them in their entirety, because there are specific details he discusses which are not present in Lazure's March 5 notes and specific details within Lazure's March 5 notes that he fails to mention.[32] O'Reilly did not testify at all with regard to whether he read Lazure's March 5 notes. He did testify that after he made the decision to investigate the story, he gave the assignment to Brown, and Brown gave it to Lazure, and "*we* started to compile information." [Emphasis added.] He also testified, speaking generally, that "*we* investigated [the story]." [Emphasis added.] There is no evidence in the record from O'Reilly about what he did or did not review to prepare for the March 5 broadcast. He did testify that he was familiar with Kadi from other press accounts prior to the March 4 broadcast.

With regard to Statement Four, O'Reilly attributes the statement to Wright and Flessner but testified that he never spoke with Wright and that he did not recall Flessner's exact words when asked whether Flessner told him that Appellee declined to secretly tape Yassin Kadi. During the March 4 interview, Flessner stated both that Appellee had been requested "to wire up on the target or one of the targets coming out of a company" in New Jersey and that an employee of BMI had contact-

**32.** In his Talking Points memo, O'Reilly specifically referenced the "office of professional responsibility at the Justice Department" investigating Appellee. Lazure's March 4 and 5 notes only state that "the FBI placed [Appellee] on administrative leave." O'Reilly also talked about Mueller's action in Boston as a federal prosecutor, special praise given by Mueller to Bowman even after the Moussaoui computer incident, and the fact that Rowley was not commended and Bowman was. He also makes general reference to "growing evidence that Mueller is a bureaucratic nightmare" and asserted that many FBI field

agents "refer to Mueller's Washington group as 'hindquarters' instead of 'headquarters.' " None of these facts are contained in Lazure's March 5 notes.

O'Reilly does mention that Wright "is writing a book, but was told that he would be charged with insubordination if he appeared on THE FACTOR last night." The two new sentences added to the large block of March 4 text in the March 5 notes are "Wright has written a 500–page book called 'Fatal Betrayal,' which he says the bureau won't let [him] publish. The bureau also pressured him into NOT doing the program last night."

ed Appellee, and they had asked him to "wire up" and meet with him, but Flessner never specified whether "the target or one of the targets" was or was not Kadi. Statement Six essentially repeats the information in Statement Four, that Appellee refused to record "a Saudi named Yassin Kadi," who was "suspected of bankrolling Usama bin Laden." Lazure's March 4 notes do not contain any information on Flessner's point of view because he was unavailable for her to pre-interview.

The only reference to secret recording and Kadi in Lazure's March 5 notes is the single sentence buried within the block of the prior day's information, referring to Kadi's "suspected associate," and, other than a similar statement about Kadi financing Osama bin Laden, none of the new facts about Kadi are mentioned by O'Reilly.[33]

During his March 6 interview with Vincent, O'Reilly asked, "And you wanted [Appellee] to record a Saudi who was under suspicion of financing Osama bin Laden, correct?" To which Vincent replied, "[I]ndirectly, yes," and then clarified that it was "an official in an East Coast company that was under investigation by Robert Wright's case," who was a Muslim. Subsequently, O'Reilly asked, "Was it al Qaeda? Was it—because we heard it was Osama bin Laden's outfit." Vincent replied, "Well, *this is Yassin Kadi*. He was involved in organizing or paying for this particular company ... [that] this fellow was working for." [Emphasis added.] Lazure's March 6 notes erroneously state in the title section pertaining to Vincent, "[F]mr FBI Special Agent (27 year veteran at bureau, who retired in Dec. 2002)— Agent Robert Wright was his partner;

they were both in the room when Muslim agent [Appellee] refused to wear wire *to investigate Yassin Kadi.*" [Emphasis added.]

 To prove malice, the plaintiff must offer proof of the defendant's state of mind at the time of publication. *Skeen,* 159 S.W.3d at 637; *New Times, Inc.,* 146 S.W.3d at 162; *see also Foster v. Upchurch,* 624 S.W.2d 564, 566 (Tex.1981) ("It is not enough for a plaintiff to show that the defendant made a mistake."); *Gonzales v. Hearst Corp.,* 930 S.W.2d 275, 277 (Tex.App.-Houston [14th Dist.] 1996, no writ) (stating that showing defendant made a mistake or erred in judgment is not enough to prove actual malice without also showing defendant's state of mind). The plaintiff must present some evidence that the defendant purposefully published mistaken facts or that the circumstances were "so improbable that only a reckless publisher would have made the mistake." *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 855 (Tex.2005). Evidence that a report was mistaken, even negligently so, is not evidence of actual malice. *Id.; Turner,* 38 S.W.3d at 120 ("A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading.").

Here, there is no evidence that O'Reilly knew he was mistaken or strongly suspected that he was mistaken at the time he made Statements Four and Six. Instead, the record reflects that it was not until the Vincent interview during the final broadcast on March 6 that the connections between Appellee's wire issue and Kadi were made clear to O'Reilly. Reviewed in the light most favorable to Appellee, although

---

**33.** O'Reilly's statement refers to "a Saudi citizen named Yassin Kadi, who was suspected of financing Usama bin Laden." Lazure's notes state that the U.S. Treasury Department froze Kadi's assets, "alleging that his Blessed Relief charity had funneled money to Osama bin Laden."

O'Reilly failed to accurately capture all of the story's details, here, the single line in the March 4 and March 5 notes, this evidence suggests an error in judgment, rather than evidence of actual malice, based on the lack of testimony that O'Reilly actually read *any* of Lazure's notes. *See Huckabee,* 19 S.W.3d at 426; *Pardo v. Simons,* 148 S.W.3d 181, 193 (Tex.App.-Waco 2004, no pet.); *see also Soodeen v. Rychel,* 802 S.W.2d 361, 363 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (stating that a party cannot avoid summary judgment by relying on circumstantial evidence that is equally consistent with the nonexistence of the fact the party seeks to prove); *see also Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997) (holding "meager circumstantial evidence" that could give rise to any number of inferences, none more probable than another, is no evidence of an ultimate fact issue). Therefore, we conclude that the portions of Statements Three, Four, and Six referring to Kadi were not made with actual malice.

### (3) Sami Al–Arian Statements

■■■ O'Reilly mentioned Sami Al–Arian in Statements Two, Three, Four, Six, Nine, and Twelve.

*March 4 Broadcast*

As addressed above, the record establishes that O'Reilly wrote Statement Three and that the statement parallels Lazure's March 4 subject headline, "Muslim Agent refused to wear wire with Al–Arian," the second paragraph of her notes, and her description of Wright's point of view.[34] Having reviewed the language used in Statement Three, the March 4 broadcast in its entirety, the depositions of O'Reilly, Brown, and Lazure, Lazure's affidavit and notes, and O'Reilly's testimony that he would not write "anything that [he] would not think is true," we conclude that there is no evidence that O'Reilly believed the statement was false, or that he had serious doubts about its truth, at the time he made the Al–Arian portion of Statement Three. *See Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696; *Skeen,* 159 S.W.3d at 637.

*March 5 Broadcast*

With regard to Statements Four and Six, although misattributed to Flessner in Statement Four, who stated during the interview when asked about Al–Arian, "I wasn't involved," the information from Lazure's March 4 notes supports O'Reilly's assertions that Wright made these accusations, and, as addressed above, there is no evidence that O'Reilly doubted Wright's credibility. Likewise, there is no evidence that O'Reilly made the statements doubting their truth or with a high degree of awareness that they were false.[35] *See Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696; *Skeen,* 159 S.W.3d at 637.

With regard to Statement Twelve, O'Reilly indicated that Flessner and Wright told him that "everybody" wanted

---

**34.** The second paragraph states:
Chicago FBI counter-terrorism agent Robert Wright, who was one of the whistleblowers on [Appellee's] refusal to wear a wire in 1999, now says that one of these incidents was in 1998, *when [Appellee] refused to record a conversation with Sami Al–Arian, who was being investigated in Tampa.* Agent Wright learned about the Al–Arian incident in 1999 when [Appellee] again refused to wear a wire to record a Muslim. [Emphasis added.]

**35.** The only portion of Statement Four not specifically complained of by Appellee is the only part without direct support in the record, in which O'Reilly stated, "Hundreds of Muslim American law enforcement agents have worn wires, according to FACTOR sources." However, there is no evidence that O'Reilly did not believe this statement to be true or that he had a serious doubt about its truth or falsity.

Appellee to wear a wire, then stated, "The Tampa office in the Al–Arian case asked the man to wear a wire. He declined." Appellee asserts that although "Tampa" is given as the source for the Al–Arian information, "in reality, [Appellant] had no information that [Appellee] had actually refused to record Mr. Arian."

■ Within Lazure's March 4 notes about Wright's point of view, Wright is credited with stating, "[S]omebody said, *call Tampa*, this isn't the first time he's [refused to wear a wire]. This is when I discovered *he had refused to wear a wire to a meeting with Al Arian.*" [Emphasis added.] O'Reilly testified that he had not been aware of any credibility issues with regard to Wright prior to the broadcast, and there is no evidence that O'Reilly either did not believe the statements attributed to Wright's point of view in Lazure's March 4 notes or that he had serious doubts about their truth.[36] A media defendant's poor choice of words or content, without more, does not amount to actual malice. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex.2003). Because there is nothing in the record to create a genuine issue of material fact with regard to Appellant's subjective knowledge of falsity or reckless disregard thereof at the time Statement Twelve was made, we conclude that there is no such issue. *See Pardo*, 148 S.W.3d at 193 (stating that a defendant's failure to capture accurately all of a story's details may suggest an error in judgment but is no evidence of actual malice).

*March 6 Broadcast*

With regard to O'Reilly's final mention of Appellee's alleged refusal to record Al–Arian, Statement Nine, Appellee states that Schippers never stated that Appellee refused to record a conversation and "that jump is made by Defendant O'Reilly, who attributes it to 'Tampa.'" As discussed above with regard to Wright's comments about calling Tampa and learning of Appellee's alleged refusal to record Al–Arian, found in Lazure's March 4 notes, and the language preceding Statement Nine from Schippers, who stated that Al–Arian had called Appellee and "[a]ll [Appellee] had to do was put an overhear device on his telephone," there is no evidence that O'Reilly believed Statement Nine was false or highly likely to be false when he made it. Therefore, with regard to the portions of Statements Two, Three, Four Six, Nine, and Twelve pertaining to Sami Al–Arian, we conclude that there is no evidence of actual malice.

*(4) O'Reilly's Presentation of Allegations as "the truth"*

■ Appellee states that, "In the Broadcasts, Appellant O'Reilly presents allegations as 'the truth.' In fact, at the time of his statements, [he] had no idea whether or not the allegations were true." Appellee also asserts that the statements were reported as true, "without any attribution or first hand knowledge." Although, by the very definition of "actual malice," Appellee's first contention eliminates the argument that Appellant *knew* the allegations were false, we must still review the statements and Appellee's summary judgment evidence for "reckless disregard." *See WFAA–TV*, 978 S.W.2d at 571 (defining "actual malice"). Statement Nine is the only contested statement in which O'Reilly asserts "the truth."

---

**36.** This is assuming that O'Reilly read the March 4 notes, as discussed above, and did not have this information from some other source not in the record. Brown testified that O'Reilly had previously had Al–Arian as a guest and then did follow-up interviews about him, and in Wright's point of view statement, he stated, "I credit O'Reilly with Sami Al Arian getting taken down."

We have found no evidence in the record to support Appellee's contention that O'Reilly's statement about "the truth," when he made it, was made with a high degree of awareness of its probable falsity and serious doubt as to its truth. *See Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696; *Skeen,* 159 S.W.3d at 637. It is not even entirely clear from the language used whether O'Reilly was asserting a belief that Wright and Vincent's allegations were true, whether he was asserting that it was true that he chose to believe Wright and Vincent, or both.[37] Based on the entire record, after three days of interviews, it would appear that O'Reilly had made up his mind about who he chose to believe out of all of the information presented by his guests. *See Brewer v. Capital Cities/ABC, Inc.,* 986 S.W.2d 636, 643 (Tex.App.-Fort Worth 1998, no pet.) (stating that there is no defamation liability for a statement of opinion when a report sets out the underlying facts in the publication itself, thereby allowing the listener to evaluate the facts and either accept or reject the opinion).[38]

While inherently improbable assertions and statements made on information that is obviously dubious may show actual mal-ice, there is no evidence in the record that O'Reilly either found the assertions made by his guests inherently improbable, or, on the face of Lazure's research and the Broadcast transcripts, that he considered the information or the informants dubious. *See Bentley,* 94 S.W.3d at 596. Therefore, we conclude that Appellee failed to bring forth evidence to create a genuine issue of material fact as to actual malice with regard to Statement Nine.

**(5) Remaining Statements**

With regard to Statements Five, Seven, Eight, Ten, and the remaining portions of Statements Six and Eleven, having reviewed them against the transcripts, the Broadcasts in their entirety, depositions of O'Reilly, Brown, and Lazure, and Lazure's affidavit and notes, we conclude that there is no evidence in the record to show a genuine issue of material fact as to actual malice.

Statement Five and the remaining portion of Statement Six were made in the March 5 broadcast and pertain to Appellee being put on administrative leave and being investigated by the Justice Department's Office of Professional Responsibili-

---

**37.** In response to Schippers' assertion that the FBI was hiding something and his question, "Aren't they interested in finding the truth?" O'Reilly made Statement Nine, "Listen, we know the truth. The truth is I believe your two agents here, this guy wouldn't tape other Muslims. That's the truth. And he wasn't disciplined."

Also, part of O'Reilly's reporting style, revealed through the review of the three Broadcasts in their totality, appears to be asserting whether something is "true" during interviews in response to guest information. For example, during the March 4 broadcast, he responded, "yes, that's not true," in agreement with one of Flessner's statements and "that's true" in his constitutional law discussion.

**38.** Under federal law, while a statement of opinion relating to matters of public concern

that does not contain a provably false factual connotation will receive full constitutional protection, an "opinion" that reasonably implies false and defamatory facts *may* be actionable. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). Where a statement of "opinion" on a matter of public concern does reasonably imply false and defamatory facts regarding a public figure, that individual must show that the statement was made with knowledge of its false implication or with reckless disregard of its truth. *Id.,* 110 S.Ct. at 2706–07. There is no evidence in the record that showing that O'Reilly knew he was making a false implication or that he had serious doubts about its truth at the time he made Statement Nine.

ty. Lazure's March 4 notes state, "Last week, the FBI placed [Appellee] on administrative leave and ordered him back to the United States."[39] The unofficial FBI statement given to Lazure on March 4 states,

> I cannot discuss the circumstances regarding the placement of [Appellee] on administrative leave. I will say that it is in no way connected with his work for the FBI in Saudi Arabia or the U.S. We received information regarding matters that happened before he had any connection to the FBI. We have placed the agent on leave because it is a pending investigation. This is in no way a national security matter—it is not even in that realm, and the decision to place him on leave is in no way associated to terrorism.

In the sentences preceding Statement Five, O'Reilly stated that Appellee apparently denied any wrongdoing, had filed an equal opportunity complaint against Wright, had been promoted, and then called back and placed on forced leave, information supported by the facts in Lazure's March 4 notes. O'Reilly asked, "Why? The FBI will not say," and then made Statement Five.[40] During the March 4 broadcast, Flessner told O'Reilly, "I'm not privy to what the reason is that they have suspended [Appellee], but clearly, there's something big going on, since they'[v]e recalled him for re-op." After reviewing Lazure's March 4 notes, the March 4 interview with Flessner, and O'Reilly's deposition, there is no basis

from which we may conclude that O'Reilly knew Statement Five and the similar portion of Statement Six[41] were false or that he had serious doubts about their truth or falsity. *See Turner,* 38 S.W.3d at 122–23.

O'Reilly made Statement Seven[42] during his interview with Baker and Statement Eight during his interview with Aldrich. Baker informed O'Reilly that when all of the facts were in, they would show that Appellee did not make the decision about whether to wear a wire, and then O'Reilly made Statement Seven. Lazure's March 4 notes include Wright's point of view, in which he stated that Appellee said, "A Muslim does not record another Muslim," there were five "agents/prosecutors in the office in Chicago who heard the statement," and "none of us could believe it." Wright continued,

> Then I called headquarters telling them what happened, and I couldn't believe their response. I thought the guy would be terminated, but they basically said "you have to understand where he's coming from." I don't understand where he's coming from—we both took the same oath, and he was saying no. This sort of thing really undermines investigations. I was so frustrated—and somebody said, call Tampa, this isn't the first time he's done this.

During the March 4 broadcast, Flessner, a former prosecutor and not an FBI agent, told O'Reilly that he was present when Appellee declined to wear the wire. Even

---

**39.** O'Reilly also stated this in his introduction to the Impact Segment in the March 4 broadcast.

**40.** "But THE FACTOR has learned that Hafiz is being investigated by the office of professional responsibility at the Justice Department. That's serious."

**41.** "[A]s we told you in the 'Talking Points' memo, an FBI Agent named [Appellee] has been put on administrative leave."

**42.** "I—I just want to—I just want the audience to know, Mr. Baker, that what you say, although it might be true, is being vehemently disputed—vehemently disputed—by a number of FBI agents involved in these investigations."

though Wright alone is not "several," Lazure's notes indicated that at least five "agents/prosecutors" heard the alleged statement and Flessner told O'Reilly that he also heard the statement. O'Reilly's poor choice of words, without any showing in his testimony to indicate that he thought he was making a false statement during his interview with Baker, or that he at least had serious doubts, does not create a genuine issue of material fact with regard to actual malice. *See Forbes Inc.*, 124 S.W.3d at 174.

The same analysis would apply to Statement Eleven, in which O'Reilly asserted during the March 5 broadcast that he had "two eyewitnesses" that Appellee refused to wear a wire twice. Flessner and Wright claimed to have heard, not to have *seen*, Appellee refuse to record another Muslim during the Chicago teleconference, and Wright, not Flessner, asserted that Appellee had also done this in Florida, based on Lazure's March 4 notes on his point of view. O'Reilly made this statement before his March 6 interview with Vincent, another FBI agent who claimed to have heard Appellee make the alleged statement.

With regard to Statement Eight, Aldrich brought up that a criterion for choosing an undercover agent was his willingness to wear, or not to wear, a wire. O'Reilly countered with, "[B]ut let's face it. We don't have very many Muslim American agents who can infiltrate terrorist organizations," and then made Statement Eight.[43] Assuming that the question in Statement Eight could constitute a statement of fact, there is nothing in the record to indicate that O'Reilly asked this question with actual malice.

Finally, in Statement Ten, O'Reilly asked another question, "Should FBI Chief Robert Mueller be fired over the scandal of a Muslim agent who failed to aggressively investigate terrorism?" During his interview with Aldrich, O'Reilly put the adverb "aggressively" into context by intimating that risking death was part of an FBI agent's job. O'Reilly testified that the story's primary focus was "The problem within the FBI, the controversy within the FBI. If one agent, two agents saying this about another agent, if the FBI not giving out information, that was the story," and that, when he did the stories in March 2003, he thought that the controversy within the FBI was the story's primary focus. He also testified that the question the Broadcasts raised over three nights was, "[D]id the FBI agent not tape a fellow Muslim suspect[?]"

■■■ Evidence that an article was written "from a particular point of view, even when [the article is] hard-hitting or sensationalistic, is no evidence of actual malice." *See Huckabee*, 19 S.W.3d at 425. And, although in his subsequent telephone conversation with Appellee, O'Reilly did acknowledge feeling "a little bit responsible for this, because I don't want you to have this kind of burden to walk around in the public with," while trying to coax Appellee

---

**43.** Statement Eight: "If you have one that says, I'm not going to record another fellow Muslim, you've got to fire him, don't you?" We note that if O'Reilly had read Lazure's March 5 notes with regard to Aldrich's point of view, he might have asked a more specific question. Aldrich stated in his point of view:

If in fact this agent refused to wear a wire, this is atrocious. He needs to hand in his credentials and badge, because we all take

an oath to the constitution, not the . . . koran. He was probably up for promotion, and the decision was made that what he did wasn't bad enough to open the bureau up to criticism for renegging a promotion. I don't believe this would ever have happened under Mueller—but it doesn't surprise me that it happened under Freeh. He never took a strong principled stand on anything.

onto *THE O'REILLY FACTOR*, O'Reilly actually stated, "*if* this is unfair, *if* you have been tainted, ... we certainly will put you in the spotlight." [Emphasis added.] There is no evidence in the record that at the time O'Reilly made Statement Ten, or any of the other statements at issue, he had any belief that the statements were not true or had serious doubt about their truth. Therefore, we conclude that, as to Statements Five, Seven, Eight, Ten, and the remaining portions of Statements Six and Eleven, there is no genuine issue of material fact with regard to actual malice.

### FOX's Selection Of Reported Material

Appellee further argues that he raised a genuine issue of material fact in response to the challenged element of actual malice through evidence that FOX chose the material for its Broadcasts—and thereby omitted other material from its Broadcasts—with actual malice.

 A broadcast's omission of facts may be actionable if it so distorts the viewers' perception that they receive a substantially false impression of the event. *Huckabee*, 19 S.W.3d at 425. A public figure or public official seeking to recover for such an omission must, however, make "the familiar showing that the publisher selected the material with actual malice." *Id.* Thus, for an omission to be evidence of actual malice, the plaintiff must prove that the publisher knew or strongly suspected that it could create a substantially false impression. *Turner*, 38 S.W.3d at 121. Evidence that a defendant selectively omitted facts to purposefully create a false portrayal of events may satisfy this test. *Huckabee*, 19 S.W.3d at 426. Moreover, an omission may be so glaring and may result in such a gross distortion that by itself it constitutes some evidence of actual malice. *Id.* "In such a case, the omission

so changes the character of the story that one could infer that the defendant knew, or at least suspected, that the omission would convey a false impression." *Id.* A failure to capture accurately all the story's details, however, suggests an error in judgment, which is no evidence of actual malice. *Id.*

 Here, as evidence of actual malice, Appellee points to O'Reilly's statements that Appellee refused to record Al–Kadi, an alleged financier of Osama bin-Laden. According to Appellee, Lazure's notes make it clear that the 1999 incident involved a "suspected associate" of Al–Kadi, not Al–Kadi himself. This is merely evidence that O'Reilly failed to accurately capture all of the story's details. O'Reilly's statements that Appellee refused to record Al–Kadi instead of a "suspected associate" of Al–Kadi suggest that he made an error in judgment. Although this might constitute negligence on the part of O'Reilly, it is not evidence that O'Reilly selectively omitted this fact to purposefully create a false portrayal of the event. Moreover, having considered the entirety of the Broadcasts, we cannot conclude that the omission was so glaring that it grossly distorted the event being reported such that one could infer that O'Reilly knew, or at least suspected, that the omission would convey a false impression. *See Huckabee*, 19 S.W.3d at 426. Because this evidence does not demonstrate that O'Reilly knew or strongly suspected that the omission could create a substantially false impression, it is no evidence of actual malice. *See Turner*, 38 S.W.3d at 121.

As evidence of actual malice, Appellee next points to O'Reilly's failure to state or otherwise indicate that the decision to not go through with the recording was ultimately made by FBI management in the Dallas office, not solely by Appellee. According to Appellee, although O'Reilly was

aware of the FBI's decision-making process, he failed to state as much during the Broadcasts, thus allegedly creating a false impression that Appellee single-handedly stopped the investigation of Al–Kadi. We held above that, even indulging every reasonable inference in Appellee's favor, a plain reading of O'Reilly's comments about Mueller, Wright, and the FBI indicated that O'Reilly did not have a clear picture about how the FBI hierarchy worked and how decisions were made within the agency. Without such an understanding, O'Reilly could not have known or strongly suspected that the omission could create a substantially false impression. Moreover, as above, we cannot say that the omission was so glaring that it grossly distorted the event being reported such that one could infer that O'Reilly knew, or at least suspected, that the omission would convey a false impression. *See Huckabee*, 19 S.W.3d at 426. Accordingly, O'Reilly's failure to explain the FBI decision-making process is no evidence of actual malice. *See Turner*, 38 S.W.3d at 121.

■ Appellee also contends that actual malice is demonstrated by O'Reilly's statements that Appellee "refused an order" because, according to Appellee, he was never ordered to partake in the recording. He reasons that O'Reilly's choice of words raised the issue of "insubordination," implying that Appellee is a "traitor" and a "criminal." Appellee's argument mischaracterizes the substance of the challenged statements because in none of them does O'Reilly state that Appellee refused "an order." Rather, O'Reilly states that Appellee refused to "record other Muslims," "wear a recording device," and "wear a wire." He also states that Appellee "declined to secretly tape a Saudi citizen." O'Reilly thus could not have known or strongly suspected that the complained of statements could create a substantially

false impression because he never made those statements. *See Turner*, 38 S.W.3d at 121. To the extent that Appellee argues that O'Reilly's use of the word "refuse" is evidence of actual malice because Appellee never actually refused to perform an order, Appellee states in his affidavit that he "*did not want to* engage in secret recording of the individual for a number of reasons" and that he "*did not want to* engage in covert recording." [Emphasis added.] O'Reilly's statements characterizing Appellee's action as a "refusal" to do those things as opposed to stating (as Appellee does in his own affidavit) that Appellee "did not want to" do those things is not such a glaring or gross distortion that it constitutes some evidence of actual malice in and of itself, as Appellee seems to argue. There is no evidence that O'Reilly knew or strongly suspected that his use of the word "refuse" could create a substantially false impression. *See Turner*, 38 S.W.3d at 121.

## CONCLUSION

Because we conclude that there was no evidence of actual malice with regard to Appellee's contentions addressed in Appellant's motion for summary judgment, we sustain Appellant's fourth issue. We need not consider the other grounds raised in the motion for summary judgment and in this appeal. *See HBO*, 995 S.W.2d at 163; *see also Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996) (holding that courts of appeals should consider all summary judgment grounds that are necessary for final disposition of the request earnestly).

We reverse the judgment of the trial court and render judgment that Appellee take nothing.